**FORT HOWARD PAPER CO. et al. v. FEDERAL TRADE COMMISSION.**
Nos. 8601, 8604, 8606, 8610.

Circuit Court of Appeals, Seventh Circuit.

July 12, 1946.

John H. Hershberger, Richard C. Stevenson, William W. Fullagar and Knapp, Cushing, Hershberger & Stevenson, all of Chicago, Ill., for Fort Howard Paper Co.

Wm. H. Leahy, of Framingham, Mass., and Robert J. Keating, of Boston, Mass., for Dennison Mfg. Co.

Joseph J. Brown, of Philadelphia, Pa., for Nat. Crepe Paper Ass'n and others.

Bernard Eskin, Abraham L. Freedman, and Wolf, Block, Schorr & Solis-Cohen, all of Philadelphia, Pa., for Reyburn Mfg. Co.

Wm. T. Kelley, Chief Counsel, Reuben J. Martin, Sp. Atty., and Walter B. Wooden, Asst. Chief Counsel, F. T. C., all of Washington, D. C., for respondent.

Before KERNER and MINTON, Circuit Judges, and BRIGGLE, District Judge.

KERNER, Circuit Judge.

Petitioners ask us to review and set aside a cease and desist order of the Federal Trade Commission, upon a complaint charging that petitioners have engaged in unfair methods of competition in violation of the Federal Trade Commission Act, 15 U.S.C.A. § 45.

The substance of the charges is that the petitioners were engaged in a "conspiracy, combination, agreement and understanding for the purpose and with the effect of restricting, restraining, suppressing and eliminating price competition" among petitioners who manufacture and sell crepe paper in interstate commerce.

Petitioners answered the complaint, and after the matters involved in the charges had been heard upon the complaint and answers, the testimony of witnesses and supporting documentary evidence, the Commission found the charges to be fully sub-

stantiated by the evidence. Summarized, its findings are set forth in the margin.[1]

In essence the findings were that there was an agreement to fix prices, zones, and trade practices, which existed under the National Industrial Recovery Act and which continued unabated and unprotested between the various manufacturers and resulted in practically identical delivered prices in the respective zones, to prearranged classifications of customers, for the various standard crepe paper products. The

[1] "Paragraph One: Respondent * * Association * * * is * * * [a] trade association * * * located at * * * Philadelphia, * * *. The present membership * * * comprises six corporations engaged in the manufacture and sale of crepe paper. * * *

"Paragraph Two: * * * The first six corporations named in this paragraph [American Tissue Mills, Bainbridge's Sons, Fort Howard Paper Co., Papyrus Co., Reed Co., and Tuttle Press Co.] comprise the present membership of respondent Association. * * * Dennison * and * Reyburn * * * were formerly members of the Association but resigned from membership in November, 1930.

"Paragraph Four: The respondent manufacturers comprise all of the manufacturers of crepe paper in the United States. * * * [They are] in competition with one another in the sale * * * of crepe paper * * * except insofar as such competition has been restrained * * * as a result of * * * practices hereinafter set forth.

"Paragraph Five: * * * Association was organized by the * * * manufacturers on July 19, 1933, * * *. * * * the Executive Committee * * * on July 26, 1933, drafted a 'Code of Fair Competition' (under the National Industrial Recovery Act) * * *. The minutes of this meeting * * * contain, under the heading 'Trade Agreement,' the following:

" * * * The Committee felt that it would be necessary * * * to draw up a Trade Agreement which would contain standard practices in reference to terms, datings, contracts, freight allowances, standards of lengths, widths, weights, etc., of Crepe Paper, crepe paper putups, bulk and package, also crepe paper accessories, selling prices, etc. * * *

"That [such] agreements * * * were * * * put into effect * * * is evident from the minutes of * * * meetings of the Association, beginning with a meeting held on August 17-18, 1933. Copies of the minutes of the meetings * * * were sent * * * to all * * * members. The minutes of the meeting held on August 17-18, 1933, * * * set forth * * * other agreements entered into by the members." (Then follows detailed provisions re selling of "seconds and closeouts" and filing statistics relative thereto with the Association; provision of 10'4" maximum length for a fold of crepe paper; specification of creping ratio; creping ratio is defined. Then follows provision for standard weight of tissue; publication of price schedules. The minutes of the meeting of August 17-18, 1933, then recite three zones for bulk, fireproof, jumbo rolls and special printed crepe paper and two zones for packaged crepe paper, decorated crepe paper, streamers and shelf paper. Then there was provision for classification of purchasers (price list varied according to classifications); dates set for price list going into effect; each manufacturer was to publish a price list and send copy to Association.)

Minutes of October 19, 1933, meeting showed confirmation of certain trade practice prices.

Minutes of November 8, 1934, meeting showed approval of change in classification list.

"Minutes of November 8, 1934, meeting showed request to the Association Secretary to re-edit price list so there would be no confusion of prices.

"Paragraph Six: While the practices * * * had their origin during the * * * [National Industrial Recovery Act] * * * the record affirmatively shows that the practices have by mutual agreement been continued by respondents since that time."

The minutes of June 11, 1935, meeting (which was shortly after the NRA was invalidated) showed that the Secretary urged co-operative effort be continued and the Secretary was directed to redraft the Association By-Laws and Constitution to eliminate reference to the Code. A motion to continue as under the NRA was passed unanimously.

"All members present agreed that they would continue to operate under the same Labor Conditions and Fair Trade Practices, as were in effect prior to the elimination of NRA, at least until such time as a definite and specific policy had been adopted by the Administration.

"Further evidence of the various agreements entered into by the respondents and of the continued operation of such

Association was the chief instrumentality to effectuate the agreement, it being the repository and dispenser of price lists, zone maps, trade practice information, volume of business statistics, etc.

All of the crepe paper manufacturers in

agreements subsequent to the NRA period is found in the minutes of later meetings * * *."

Minutes of January 17, 1936, meeting showed motion passed defining Class I buyers: Any National Advertiser having purchased at the rate of $500 per month of Crepe Paper for the prior 6 months would be classified as a Class 1 buyer for the next 6 months. The minutes of the meeting held June 2, 3, 1936, discussed the question of adopting new price structure to simplify old form. And, on June 3, a new form of price list was unanimously adopted, effective June 8, 1936.

Minutes of November 10, 1936, meeting concerning subject of excessive creping ratios and each manufacturer agreed to take up the matter with his Production Department and see that ratios received adequate and proper supervision.

Minutes of January 21, 1937, meeting showed a discontinuance of flooring crepe paper and that the only 1½ to 1 ratio paper would be the package.

Minutes of meeting held on June 23, 24, 1937, showed it was decided that it would be in order for them to use Jobbers prices with no excess for cutting when quoting on crepe paper cut to pieces.

Minutes of meeting held on May 17, 18, 1938, showed two motions made: (1) Each member to phone or wire Secretary's office simultaneously when published price list changed. The motion was carried unanimously. (2) All but one agreed to motion to send copies of orders and invoices to Secretary's office promptly.

Minutes of meeting held on May 2, 3, 1939, showed the Statistical Bureau of the Association was directed to compile a list of A Buyers whose purchases averaged over 100 gross a month over six months, and a list of B Buyers whose purchases averaged from 25-89 gross over a six-month period.

"Paragraph Seven: The Commission finds from the evidence * * * that * * * respondents have * * * put into operation * * * an agreement * * * and conspiracy to restrain and suppress price competition in the sale of crepe paper. * * * the respondents * * * agreed to file and have from time to time filed with * * * Association their price lists showing current and future prices for their products, and the information disclosed by such lists has by mutual agreement been disseminated among all of the respondent manufacturers by the Association. Copies of invoices * * * have also been filed with the Association by some of the respondent manufacturers.

"In further pursuance of their agreement, the respondents have cooperatively established and maintained a 'zoning plan,' * * *. Under this zone agreement, uniform delivered prices were established * * * within a particular zone, with uniform price differentials among the several zones.

"Purchasers * * * of crepe paper have by agreement * * * [of] respondents been divided into certain classes for pricing purposes, depending upon the quantity of paper purchased and upon whether they were regarded by the respondents as jobbers, syndicates, etc., with uniform prices and price differentials established for each class of purchasers.

" * * * the respondent manufacturers [have agreed upon] * * * other matters affecting the prices of their products, including creping ratios, sizes, weights, and the sale of seconds or closeouts.

"Through * * * these means * * * the respondent manufacturers have cooperatively * * * maintained uniform prices * * *. Not only is this evident from the minutes * * * but the record is replete with correspondence between the Association and its members, and among a number of the members themselves, showing the existence of price agreements. The conclusion is inescapable that as a result of these agreements competition among the respondent manufacturers was substantially restrained * * * insofar as prices were concerned.

"Paragraph Eight: Each of the respondents has acted in concert * * * with one or more of the other respondents in doing * * * the acts * * * herein set forth in furtherance of such agreement, * * *.

"Paragraph Nine: The * * * effect of the agreement * * * [has] been * * * [to] unlawfully * * * restrict * * * suppress, and prevent price competition among the respondent manufacturers in the sale of crepe paper * * * and * * * unlawfully to * * * restrain trade in such products in commerce * * *.

"Conclusion. The acts and practices of the respondents * * * are all to the prejudice of the public and constitute unfair methods of competition in commerce within * * * the Federal Trade Commission Act."

the United States (the eight accused manufacturers) belonged to the Association, which was an outgrowth of the NRA. In November, 1939, Reyburn and Dennison withdrew from membership. Dues in the Association were based on a percentage of the volume of business.

The Commission laid heavy reliance on the minutes of the Association and on correspondence, particularly between accused manufacturers, not here petitioning for review, and the Association.

Upon these findings of fact the Commission directed the petitioners and five other paper companies to cease and desist from continuing a combination to establish uniform prices for crepe paper and related trade practices. "It * * * Ordered that * * * National Crepe Paper Association * * *, Fort Howard Paper Company, * * * Dennison Manufacturing Company, and The Reyburn Manufacturing Company, * * * in connection with the * * *, sale, and distribution of crepe paper in commerce * * * do forthwith cease and desist from entering into, continuing, * * * any planned common course of action, agreement, understanding, combination, or conspiracy * * * to do or perform any of the following acts or things: 1. Establishing or maintaining uniform prices for crepe paper, or * * * maintaining any prices at which crepe paper is to be sold. 2. Establishing or maintaining delivered price zones or price differentials between * * * such zones. 3. Establishing or maintaining classifications of customers * * * for pricing purposes. 4. Adopting or maintaining uniform standards governing creping ratios, sizes, or weights of crepe paper, or the sale of seconds or close-outs, * * * [to maintain] uniform prices for crepe paper. 5. Filing * * * [with the] Association * * * copies of invoices, or price lists showing current or future prices for crepe paper. 6. Engaging in any act or practice substantially similar to those set out in this order with the purpose or effect of establishing or maintaining uniform prices for crepe paper."

There was a consensus of opinion among the petitioners that crepe paper is a standard product—no one could obtain a greater price for it than another inasmuch as quality does not vary. All use similar tissue paper, which is "creped"or crinkled on similar creping machines so that the resultant product is identical irrespective of the manufacturer. The industry has found that the "creping ratio"—which means the ratio of the length of the paper before, and after, creping—should vary according to the use for which it is to be put—draping crepe requires a denser creping ratio than flooring crepe, and that the NRA served to standardize the resultant product, as to permissible length of crepe paper in a packet, etc.

The important issue is the existence of evidentary support in the record to sustain the findings. Petitioners contend the only basis is the possible inference to be drawn from similarity of prices and trade practices. They contend that inference is completely dispelled when it is recognized that crepe paper is a standard product which must be offered at the lowest price quoted by any competitor, or the sale is lost. *The uniformity in price therefore is solely the result of competition—not agreement.*

The record discloses meagre *oral* testimony indicative of an affirmative agreement (*after* the NRA period) on the part of the companies, or any of them, as to prices charged, zones adopted for similar delivered prices, identical price differentials between the zones, interchange of price lists, or agreement as to color, creping ratio, size of packets, etc.

Rather, the officers of the companies and of the Association testified that identity of such trade practices grew out of the practices of the NRA period, or were ancient custom, or were the inevitable result of meeting competition. They testified that the most important factor in the fixing of a sales price was the competitor's price—a lowering of price had to be met (and they were generally agreeable to a raising of a price if the trade could be induced to stand it).

They assert the zone system which divided the United States into three zones for the sale of "bulk" crepe paper and two zones for the packaged crepe paper was

for convenience of the industry and public, so that nation-wide syndicates could purchase the product for the same price irrespective of where the user was located within the zones. The use of zones obliterated the necessity for the use of cumbersome railroad freight books.

Each of the petitioners denied that any agreement inter partes predicated any of the uniform trade practices which the Commission charged and found to exist. For a while, they had filed prices with the Association but ceased to do so shortly after the Schechter decision. A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. They had also filed with the Association statistics on the volume of their individual sales. The Association compiled this data and informed its members of the total number of sales in the industry so that each member could tell where it stood in the industry.

They testified they found out their competitors' prices through their customers, or their salesmen, and immediately took action to conform thereto in order to retain their business. When they made a price change they notified their customers accordingly, through their salesmen or by direct notification.

Price for the crepe paper product is generally determined by mill price F. O. B., with *"freight allowed"* which results in an identical delivered price to purchasers in each respective zone.

*Fort Howard Paper Company.* This petitioner is a Wisconsin corporation with its plant and principal place of business at Green Bay, Wisconsin. It concedes that the published prices of all manufacturers are generally identical, but there is not that uniformity in other terms and conditions of sale, such as the number of days for which a 2% discount is allowed. It denies any participation in the alleged agreement. It points out that but approximately 1% of its business concerns crepe paper, which 1% is principally bulk pack display paper sold to large advertisers. It states that before the NRA it charged mill price Green Bay, Wisconsin, plus freight (with *no* allowance for freight), but that "this

was clumsy, confusing and generally unsatisfactory because it necessitated accumulating a vast bulk of tables of freight rates so that the company could equalize charges, that is, make the total cost to a customer at a given destination as low as that of a competitor in order to be able to compete with him for the business." It says its selling prices are often lower than the published prices. It points out that sending out of price lists after NRA by the Association was sporadic and in response to a request by a member therefor, and that there had been a considerable price fluctuation in bulk crepe paper from time to time. Fort Howard's prices changed March 16 and May 25, 1938, January 6, 1940, January 2, and April 2, 1941. It cites changes of other companies. It uses the zoning system because it is convenient and satisfactory and there has been no reason to change. Its use of the zoning system differs from the Association map in that it includes in Zone 1 all cities on the Missouri River northwest of St. Louis (i.e., Kansas City, Omaha, Sioux City, and parts of eastern South Dakota and North Dakota). When it entered the business it adopted the standard size of package of crepe paper then being sold. It states its weight of a gross of folds packed for shipment is 27 pounds as compared to Dennison's of 25 pounds. Its draping crepe ratio is $2\frac{1}{4}$ to 1. The Association is the central source with which the OPA and WPB can communicate, and these agencies have asked that there be such a source. Fort Howard was present at only five meetings of the Association and asserts it does not solicit chain stores (syndicates) or sell to retail stores direct. Its only price differential is based on size of order.

*Dennison Manufacturing Company.* This petitioner is a Massachusetts corporation with its principal plant at Framingham, Massachusetts, and has nationwide distribution. Its chief contention is that it resigned from the Association November 10, 1939 (16 months before the Commission's investigation was commenced and 23 months prior to the filing of the complaint) and has had no contact with the Association or the other manufacturers since. It meets a price decrease of a competitor as soon as it finds it out. Its practices and

prices are not identical with those of its competitors;[2] its zones are not co-extensive with its competitors, but are arranged in relation to distance, and there is no evidence that it classifies its buyers; and that the cease and desist order covers points with which it has no connection. It says it has maintained an "independent course of action" and contends the findings and the cease and desist order are too general in that they do not state to which petitioner each finding is specifically applicable.

Dennison complains that the Commission's order is inappropriate in paragraphs 1-3 because it prohibits maintenance of uniform prices, delivered price zones and classification of customers inasmuch as it had acted independently therein and did not even classify its customers. It claims paragraph 4 as to uniform standards is inaccurate because its action there too is independent. Paragraph 5 prohibiting invoice filing is clearly erroneous since November, 1939, it has not filed price lists. Nor should the order direct it to show compliance because there is no way for it to do anything more than it is doing.

*The Reyburn Manufacturing Company.* This petitioner is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. It, too, resigned from the Association in November, 1939. It points out that the minutes of the June 11, 1935, Association meeting continued NRA practices in effect but disclose no representative of it present, and that at subsequent meetings there were merely "discussions" of trade practices. It says it maintained an "independent" course of action and sent no price lists to the Association after quitting same and sent no invoices after the NRA period. Many matters discussed at Association meetings did not pertain to Reyburn's business activities, such as classification of buyers and syndicates. No Reyburn representative was at any discussion which even remotely concerned prices. No correspondence concerning prices involved Reyburn. Reyburn relies heavily on the testimony of its representative to Association meetings to the effect that he was under strict instructions from his Company to leave Association meetings and not participate therein whenever discussions of prices arose. Reyburn also relies upon its withdrawal of membership in the Association as a basis for invalidating a later cease and desist order.

█ It is the agreement to fix prices in concert that renders the conspiracy illegal. No formal agreement, however, is necessary to constitute an unlawful conspiracy. The essential combination or conspiracy may be found in a course of dealings or other circumstances as well as in any exchange of words. It is not the form of the combination or the particular means used, but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. American Tobacco Co. et al. v. United States, 66 S.Ct. 1125. True, the mere filing of price lists, or the use of pricing zones, or the existence of an identical or substantially similar price for a standard product is not conclusive evidence of an illegal conspiracy. Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Sugar Institute, Inc., v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; Salt Producers Ass'n v. Federal Trade Commission, 7 Cir., 134 F.2d. 354; United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302; Cement Manufacturers.

[2] Terms are 2% 10 days—net 30, or 2/10 E.O.M. (End of Month). It has retail stores in New York, Boston, and Chicago and gives door delivery on any amount in those cities and except for those does not allow freight on less than 100 pounds. Has sold crepe paper fold 10' x 20" long as far back as 1906. Its choice of colors is independent. In 1906 it had Imperial crepe in 34 colors. As to creping ratios Dennison points out the Commission's own exhibit shows Dennison does not sell bulk crepe by ratio. Fort Howard made no 2½—1 ratio and only five of the 8 manufacturers made 2—1 crepe.

Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121. With these observations in mind, we pass to the question whether there was here an agreement to fix prices for the purpose and with the effect of restricting and eliminating price competition among these manufacturers and sellers of crepe paper in interstate commerce.

As we have already observed, we have here a finding of the existence of an agreement to suppress competition. This finding of the Commission was made upon all the evidence, including the conditions existing in the industry. It was not a finding based simply on inference. It was a finding of fact based on actualities. The existence of substantial similarity in delivered prices to zoned territories having identical zone price differentials, by six manufacturers located at different places, was not a happenstance. Nor, looking at the situation objectively, was it the inevitable and unescapable result of keen competition in a standard product of invariable qualities. To be sure, a keen competitor strives to meet a lowered price of a competitor immediately upon becoming aware of it, but he does not strive to and invariably match a price which is *higher* than that at which he needs profitably to sell, unless by express, or tacit agreement, all manufacturers have found existence to be less strenuous for all concerned by merely setting a price for three zones in the whole United States, and except for such (identical) zone differentials, discarding and ignoring the substantial item of freight. We are unable to comprehend a manufacturer's disdain of a natural advantage utilizing the same to gain local business, unless he were indoctrinated with the belief (or forced by superior economic competitors to align himself to concerted action of identical delivered prices) that elimination of all competition was economically preferable.

True, convenience of the use of zones is not to be denied, but mere convenience does not induce competitors approximately one-third of the nation's width apart to consider themselves concentric in mapping of zones. One glance at the three zone map for bulk crepe will show the artificiality of the zone structure and intention to obviate any natural advantage of location from price determination. Two of the companies are located in Wisconsin, and the western limits of the zone run merely to the Mississippi River while the eastern boundary runs to the Atlantic Ocean. Zone I is obviously drawn to include all manufacturers and put them on a par. The unfairness of this is shown by the fact that a purchaser in the adjacent states of Minnesota and Iowa would pay the additional fixed price differential to that paid by purchasers in the remote New England states. The zoning system here employed is an enormous exaggeration of the basing point system, having *nineteen states* as the focal basing point. The packaged crepe zone system split the nation (but not into equal halves) into two parts.

This zoning system arose under the NRA, which fact saved its illegality for the statutorily exempt period. When that immunity was lifted the illegality was again apparent and it is more than an inference to say that parties continuing to utilize that zoning system, born of agreement, suddenly utilized it in order to meet competition, rather than by tacit agreement.

A study of the legal problems of this case and of those involved in two comparatively recent cases decided by this court (United States Maltsters Ass'n et al. v. Federal Trade Commission, 7 Cir., 152 F.2d 161; and Milk & Ice Cream Can Institute et al. v. Federal Trade Commission, 7 Cir., 152 F.2d 478) show striking similarity of issues. Very pertinently it was pointed out in the Maltsters case, 152 F.2d at pages 162 and 164:

"As might be expected, there is little, if any, direct proof of an express agreement. Such proof, however, is not necessary. The agreement may be inferred or implied from the acts and conduct of the parties as well as circumstances pertinent thereto. * * *

"Any other conclusion would do violence to common sense and the realities of the situation. The fact that petitioners utilized a system which enabled them to de-

liver malt at every point of destination at exactly the same price is a persuasive circumstance in itself. Especially is this so when it is considered that petitioners' plants are located in four different states and that the barley from which the malt is manufactured is procured from eight or nine different states. * * * It may be true, as pointed out by petitioners, that a decrease in price by all members is necessary when such decrease is announced by any one member in order to meet competition. It certainly cannot be claimed, however, that it is necessary that all members increase their price upon announcement of an increase by one member in order to meet competition."

In the Milk Can Institute case, 152 F.2d at pages 480 and 481, the court said:

"In reality, the essential question for our determination is whether the members of the Institute acted in combination or by agreement for the purpose of fixing prices, or their activities contributed to such result, as found by the Commission. * * * In determining whether such finding is supported, it is not necessary, as argued, that there be direct proof of an agreement. Such agreement may be shown by circumstantial evidence, and the Commission, the same as any other fact finding body, is entitled to draw any reasonable inference from the circumstances of the situation. * * *

"It is argued, perhaps correctly, that such a freight system has long been employed by industry so that members thereof might deliver their product at the same price. In fact, the Commission recognizes that this freight equalization plan was used by petitioners prior to the organization of the Institute. Such being the case, the fact still remains that it was employed by petitioners for the purpose of fixing the delivered price of their product and by such use price competition was eliminated or at any rate seriously impaired. On the face of the situation, it taxes our credulity to believe, as argued, that petitioners employed this system without any agreement or plan among themselves. * * *"

Without doubt some of the associations involved in prior price fixing and unfair competition cases have been a great deal more active in effectuating and vitalizing a combination, but in several of those cases the industry has been larger, the companies involved more numerous. This case concerns a relatively old industry, involving but eight companies. Trade practices were rarely varied, and with the use of the zone system the delivered prices were practically identical. The Association attempted to justify its existence and through promotional efforts sought to increase the volume of business, sought to aid the members in the obtaining of desired information, and acted as a unifying agent, in earlier times for prices, then, of invoice statistics. The documentary evidence touched upon in the findings of the Commission discloses not a few hints of its earlier value as a price exchange bureau; also as an aid to keep recalcitrant or derelict members in line with price policy.

We think the artificiality and arbitrariness of the zone structure is so apparent it can not withstand the inference of agreement. The Commission evidently could not believe that Wisconsin companies would deprive themselves of the natural benefit of location in the midwest, and proximity to the west, over eastern competitors, were it not agreed that they would have equal chance for the eastern business, where most of the crepe paper manufacturers were located.

■■ The weight to be given to facts and circumstances, as well as the inferences reasonably to be drawn therefrom, is for the Commission, Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534, and as has often been stated, we are not original triers of the facts; we review the evidence to ascertain the existence of substantial evidence to support the findings, which, if supported by substantial evidence, are conclusive. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141. Such evidence exists in the instant case.

■ Denison and Reyburn place great reliance upon their withdrawal from the Association long before the Federal Trade Commission's investigation even began.

Such withdrawal, while of some persuasive import, does not negative the continued adherence to all the trade practices and zone system theretofore in existence, which resulted in substantially identical delivered prices. We do not feel theirs are cases of such good faith cessation of illegal activities as denies the Commission of the power to issue a cease and desist order.

The Commission's order is affirmed and an enforcement decree will be entered. It is so ordered.