## ALLIED PAPER MILLS v. FEDERAL TRADE COMMISSION.

### No. 8911.

Circuit Court of Appeals, Seventh Circuit.
June 11, 1948.

Wm. W. Corlett, Robert E. Canfield and Alfred McCormack, all of New York City, T. W. Brazeau and Brazeau & Graves, all of Wisconsin Rapids, Wis., and F. Harold Murtfeldt, of Chicago, Ill. (Murray W. McEniry and Allen F. Maulsby, both of New York City, of counsel), for petitioner.

Walter B. Wooden, Associate Gen. Counsel, and W. T. Kelley, Gen. Counsel, Attys. Federal Trade Commission, both of Washington. D. C. for respondent.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

This is a petition to review a cease and desist order of the Federal Trade Commission and to set aside the Commission's findings as to the facts and conclusions upon which the order is based. In the alternative, we are asked to modify the order and such findings as are unsupported by the evidence or by the law.

The petitioners are some forty-two corporations engaged in the manufacture, sale, and distribution of book paper, the Book Paper Manufacturers Association, and the Association's officers and representatives. The Book Paper Manufacturers Association, hereafter referred to as the Association, is a voluntary, unincorporated body composed of manufacturers of book paper. It was organized in June 1933, in connection with the National Industrial Recovery Act, 48 Stat. 195, with its executive committee in substance as the executive authority of the N.R.A. code for book paper manufacture. Each corporate petitioner is a member of the Association and each is engaged in interstate commerce. No single corporate petitioner produces more than 10% of the industry's output.

The complaint against the petitioners charged them with engaging in unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a), by entering into among themselves since June 16, 1933, and for more than two years last past, a combination to suppress or restrict price competition and to fix prices. After extensive hearings, the Commission found against the petitioners and issued its order directing them to cease and desist from price fixing and from certain specified activities for the purpose of price fixing.

Broadly speaking, book paper is any paper which contains not more than 25% groundwood and which is customarily used for printing purposes. The more important kinds of book paper are those used in books, magazines, and pamphlets, offset paper used in the offset printing process, envelope paper, and tablet paper. Other types include paper used in adding machines, for calendars, menus, posters, decalomania, and transfer printing. Book paper may be divided on another basis into coated and uncoated paper, the former being paper which after manufacture is coated on one or both sides to improve the printing surface. There are several grades of coated and uncoated paper.

Manufacturers of book paper sell variously to paper merchants, users, or both in varying degrees. Approximately 55% of the book paper production is sold by the mills to the users, principally magazine and book publishers, converters, and printers. The remaining 45% is sold to merchants for resale. Approximately 55% of the total tonnage sales, both to users and merchants, is made on the basis of negotiated contracts. "Spot transactions" comprise the other 45% of the total tonnage sales; a "spot transaction" is a sale resulting from an order for a stated kind and quantity of paper to be delivered on a specified date or dates at an agreed price. Of the spot transactions, a majority are between the mill and the merchant. Paper merchants usually buy and sell book papers produced by more than one manufacturer.

Some manufacturers produce both coated and uncoated papers, others produce only one kind; some produce coated paper only and buy uncoated paper from other producers; some produce only a few grades of either coated or uncoated paper, while others produce many; some concentrate largely upon offset papers or envelope or tablet papers, while many have specialized papers not closely related to any of the standard grades. Book papers are made in many types, sizes, weights, and colors, and with many different special characteristics for particular uses. Paper of any designated grade produced by one manu-

facturer is not necessarily identical with that classified in the same grade but produced by another manufacturer. All papers classified in one grade compete primarily with one another and are considered equivalent by petitioners for pricing purposes. However, there is also competition between adjoining grades because it is frequently possible to substitute one for another.

Petitioner Consolidated Water Power and Paper Company, of Wisconsin, hereafter referred to as Consolidated, has separately attacked the Commission's order. For reasons that will be developed, we deem it necessary to detail the facts of its operation since they are not the same as those of the other corporate petitioners. The Commission here has acknowledged Consolidated's unique situation, but it did not make any separate findings as to it.

Ninety-five per cent of Consolidated's production within the scope of this proceeding is coated book paper, comparable in quality but not meeting the specifications of the so-called standard grades of coated papers manufactured by other mills. This departure from standard specifications results from the groundwood content of Consolidated's product. This coated paper is the exclusive product of Consolidated by virtue of its patent which manufactures and coats paper in a single process at great speeds as compared with the other corporate petitioners' separate and slow coating process after manufacture. Because of its patented process and inexpensive pulp, Consolidated is able to sell its coated paper at prices substantially lower than the published list prices of the standard grades of coated papers. In fact, Consolidated sells its coated paper within the lower price range of the uncoated (and, of course, inferior for printing purposes) paper of the other corporate petitioners. In the five-year period beginning in January 1935, the date of Consolidated's manufacture by the patented process, it has developed an annual market in coated papers of 80,000 tons, a substantial portion of which business was formerly held by the other corporate petitioners. At no time did Consolidated submit a bid for Government business, but it is a member of the Association.

Essentially, the combination and conspiracy charged against all the petitioners was to fix prices to customers located throughout the United States, including the United States Government as a customer, by the following means. Certain of the corporate petitioners organized the Association in June 1933; all others have joined it since and have used it since its organization as a clearing house and means of exchange for information submitted to it by the members, including sales reports, prices, discounts, and terms of sale. Regular meetings of the Association are held from time to time at which the corporate and individual petitioners discuss trade and competitive conditions and agree upon and fix trade policies and prices to be charged.

It is further alleged that the petitioners have formulated and adopted uniform finishing differentials which they use without regard to the actual cost of the finishing operations to the respective petitioners. The petitioners have promulgated and compiled so-called trade customs in the form of rules and regulations dealing with allocation and classification of grades, grading, quotations and sales, and other similar matters, and including a pricing guide containing a zoned map of the United States with price differentials according to zone. It is alleged that the petitioners generally use these rules and regulations.

The individual petitioners are alleged to have been and to be the officers and members of the Association executive committee, and as such, have complete charge of its activities and meetings, the collection, compilation, and dissemination of information, and the formulation of trade policies. The corporate petitioners have adopted and maintained an identical zoning system for price fixing purposes by means of which the United States is divided into four zones. The corporate petitioners all sell at fixed and identical delivered prices within these zones. The price for Zone 1 constitutes the base price; the prices for the other zones are the Zone 1 base price plus a fixed and uniform differential for each zone. A single delivered price applies at each and every destination within the re-

spective zones, no matter what place of shipment or place of delivery is involved.[1]

The Commission found the facts substantially as charged in the complaint. We shall discuss the findings below insofar as it is necessary to decide the case. We do not set the findings out in full, but they may be found in the record of these proceedings before the Commission. Vol. 40 Federal Trade Commission decisions, 696.

■ At the outset, is is well to decide the extent of our jurisdiction to review these proceedings. There can be no doubt of its limited character. The Federal Trade Commission Act provides: "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C.A. § 45(c). This statute as interpreted by the Supreme Court gives finality to the Commission's findings of fact if they are supported by substantial evidence. Federal Trade Commission v. Algoma Lumber Co. et al., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S. Ct. 255, 71 L.Ed. 534. We do not weigh the evidence or consider the credibility of the witnesses. Triangle Conduit & Cable Co., Inc., et al. v. Federal Trade Commission, 7 Cir., 168 F.2d 175. All reasonable inferences from the facts are likewise for the Commission. Federal Trade Commission v. Standard Educational Society et al., 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141; Triangle Conduit & Cable Co., Inc., et al., supra; Fort Howard Paper Co. et al. v. Federal Trade Commission, 7 Cir., 156 F.2d 899, 907. If there is substantial evidence, though it be conflicting, the findings cannot be disturbed. Fioret Sales Co., Inc., et al. v. Federal Trade Commission, 2 Cir., 100 F.2d 358, 359. In view of this, we cannot sustain the petitioners' contention that where two contradictory and reasonable inferences may be drawn from the same evidence, the reasonable inference of guilt found by the Commission is not supported by substantial evidence. If the Commission's inference from the facts is reasonable, our inquiry ceases.

■ Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a), which petitioners are found to have violated prohibits unfair methods of competition in commerce. A price fixing combination or agreement is clearly an unfair method of competition within the Act and is illegal. Federal Trade Commission v. Cement Institute et al., 68 S.Ct. 793. Any similar combination or agreement which tampers with the price structure is an unlawful activity. United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129; Triangle Conduit & Cable Co. Inc., et al. v. Federal Trade Commission, supra.

■ The petitioners here contend that the scope of the proceedings against them has been limited to spot transactions to merchants, and does not include contract sales, or spot transactions with non-merchants. They base this contention on objections to certain evidence made by the Commission in the trial, and they argue that the findings and evidence do not expressly relate to other than this limited issue. The Commission denies such a limitation of issues and explains its objections to this evidence on other and satisfactory grounds. Further, the Commission points out that the very fact of its not having expressly limited its findings argues against such a limitation. It contends also that the evidence is not so limited—as, for example, the uniform contracts prepared and distributed to the petitioners by the Association, and the bids for Government business, which sales are contract sales. In view of this, we hold that the issues are not limited as contended by the petitioners, and if the findings are otherwise adequate and the evidence substantial, they must be upheld as to the several types of sales.

With these preliminary questions decided, there remain but two issues in the case. The first is that of the adequacy of the findings as to the facts. The petitioners have sharply and extensively argued that the findings are insufficient as a matter of law to support the order to cease and desist. The remaining question is whether there is substantial evidence to support the findings as to the facts. As indicated above in the resume of the complaint, the petitioners are charged with concertedly adopt-

---

[1] The N. R. A., which was terminated May 27, 1935, granted immunity during its existence for the activities charged herein.

ing and using several devices as the means of their total conspiracy. For purposes of this opinion, we shall refer to the concerted means that formed parts of the total conspiracy, and to the total conspiracy itself.

As to the adequacy of the findings as to the facts. In considering the petitioners' contentions in this respect, it is well to keep in mind that findings are to be construed liberally in support of a judgment or order. Triangle Conduit & Cable Co., Inc., et al. v. Federal Trade Commission, supra. Reasonable inferences which may be based on facts found will be deemed drawn; and words fairly importing a concerted activity or conniving together to restrain trade are sufficient to charge such a conspiracy. Triangle Conduit & Cable Co., Inc., et al. v. Federal Trade Commission, supra; American Tobacco Co. et al. v. United States, 6 Cir., 147 F.2d 93, 117.

As we understand the petitioners, they object to the finding of the total combination and conspiracy for indefiniteness. In accordance with the allegations in the complaint, the Commission's findings include a finding of each of the methods or techniques used to accomplish the purposes of the total combination and find categorically that such methods or techniques were arrived at through agreement and concert. The findings as to the facts conclude:

"* * * the Commission * * * finds, that the capacity, tendency, and effect of the combination maintained in the manner aforesaid and the acts and practices performed by respondents thereunder and in connection therewith, as set out herein, has been, and is, to hinder, lessen, restrain, and suppress competition in the sale of book papers * * *."

We hold that these words, read in conjunction with the other findings, are sufficient as a matter of law. Federal Trade Commission v. Cement Institute et al., supra. Reasonable men cannot be so deceived as to mistake these words for other than a finding of a combination and conspiracy to fix prices. The findings apply to all petitioners—they are all named in

the earlier findings, and both the ultimate finding above and the findings of agreement as to the particular means of the total combination refer to "the respondents." The findings of the concerted activities as the means of the total conspiracy are also set out with unmistakable particularity and adequacy.

The petitioners contend further that even if the findings of combination and conspiracy to fix prices are sufficient, there is no adequate finding that such combination and conspiracy resulted in uniformity of price. However, the findings as to the concerted means and methods of the total conspiracy are replete with references to price uniformity and the varying degrees thereof achieved. Moreover, the final paragraph of the findings reads:

"* * * the Commission * * * finds, that the capacity, tendency, and effect of the combination maintained in the manner aforesaid * * * has been, and is, * * * to prevent, hinder, and restrain the operation of competitive forces which tend to disturb the uniformity of prices established and maintained through the aforesaid means."

We hold that as a matter of law this finding, when considered in connection with the prior findings and subsidiary findings of fact, sufficiently finds the wrong of fixing uniform prices resulting from the combination and conspiracy. Like the other findings, it refers to all petitioners and is adequate in that regard.

The remaining question is as to the sufficiency of the evidence to support the findings. The petitioners[2] contend at the outset that there is no substantial evidence that prices were in fact in any substantial uniformity and therefore that the finding to that effect, supra, and according subsidiary findings must be set aside. We must also reject this contention. There was evidence of the prices for spot sales to merchants for two different periods, one the week ending April 3, 1937, and the other the week ending July 16, 1938. Invoices were studied, analyzed, and tabulated in various ways, and they showed that in the 1937 period 85.62%

---

[2] References to "petitioners" hereafter do not include Consolidated unless it is specifically so stated.

of sales were in agreement with the uniform price list; these sales represented 72.40% of tonnage and 75.63% of dollar value. For the 1938 period, 86.14% were in agreement with the uniform price list; these sales represented 77.64% of the tonnage and 79.56% of the dollar value. As we understand the petitioners, they do not deny the truth of this evidence, but seek to discredit it with arguments going to its weight and by pitting against it expert evidence of their own. Clearly, our appellate function does not involve the sort of review that the petitioners seek of this evidence.

Even without this definitive evidence of substantial uniformity, this general finding is supported by such items of evidence as the petitioners' refusal to fill an order which petitioner Allied's merchant-agent had obtained when he cut his offering price to the United States Government, even though such price cut was to come out of the agent's commission; the undisputed uniformity of bids to the Government after N. R. A. ; the reams of correspondence among and concerning the petitioners; and the petitioners' conduct through the Association when faced on occasion with breaking prices. The Commission's inferences from all of the above were reasonable. This view of the evidence has its legal basis in the clear law that price fixing as an unlawful act includes any tampering with or manipulation of prices. It includes more than the mere establishment of uniform prices, and it is not important that the prices fixed were not fixed in the sense that they were uniform and inflexible. United States v. Socony-Vacuum Oil Co., Inc. et al., supra, 310 U.S. at pages 221, 222, 223, 60 S.Ct. at pages 843, 844, 84 L.Ed. 1129; Triangle Conduit & Cable Co., Inc. et al. v. Federal Trade Commission, supra.

■■■■ The petitioners argue that there is no substantial evidence to support the finding of the total conspiracy. A combination or conspiracy can be shown by circumstantial evidence. Triangle Conduit & Cable Co., Inc., et al. v. Federal Trade Commission, supra; United States Maltsters Ass'n et al. v. Federal Trade Commission, 7 Cir., 152 F.2d 161, 162. The evidence here which supports the finding of combination and conspiracy is legion: all the petitioners expressly pledged their continued cooperation with the Association upon the termination of the N. R. A. ; the petitioners continued to file price changes with the Association on forms provided by the Association therefor and these changes were disseminated by the Association; many petitioners mailed their new base prices directly to other petitioners; the Association prepared standard contract forms containing specified provisions relating to ultimate prices, and most of the petitioners used these forms with or without minor variations; and the Association held frequent and well attended meetings. The petitioners do not controvert the truth of this evidence, but address arguments to its weight and the inferences that should have been drawn therefrom. We cannot say that the Commission's inferences are unreasonable. The petitioners did with varying uniformity use the zoning system of price quoting, and the existence of this plan which equalizes delivered prices of competitors having widely different costs at a given destination, is strong evidence in itself of an agreement to use such plan. Triangle Conduit & Cable Co., Inc., et al. v. Federal Trade Commission, supra; Fort Howard Paper Co. et al. v. Federal Trade Commission, supra, 156 F.2d at page 907. Moreover, a uniform participation by competitors in a particular system of doing business, where each is aware of the others' acts and where the effect is to restrain commerce, is sufficient to establish an unlawful conspiracy. William Goldman Theatres, Inc., v. Loew's, Inc., et al., 3 Cir., 150 F.2d 738, 745.

The record is replete with documentary evidence composed of correspondence, Association minutes, and oral testimony, from all of which combination and conspiracy is the reasonable, if not required, conclusion.

■■■■ The petitioners finally contend that various findings of agreement among them as to the means and methods used to accomplish the total combination and conspiracy are not supported by the evidence. It is these several activities, used for the purpose of continuing the petition-

ers' combination and conspiracy to fix prices, which are prohibited in the Commission's order. Without setting out all of these findings, let us examine several pertinent ones to see if there is substantial evidence to support them. The Commission found that the corporate petitioners by agreement adopted so-called trade customs in 1933, when such adoption was legal by virtue of the N. R. A. These trade customs included price differentials for coated and uncoated paper, according to size, weight, and packaging. The Commission found further that these trade customs were revised and expanded by means of agreement in 1936, after the N. R. A. period, and that they have been and are in general use. To support this finding, without going into detail, are the minutes of the Association and testimony of witnesses, manifestly capable of supporting a finding of collusion and agreement.

The Commission further found that the zoning system was continued after the N. R. A. by mutual understanding and consent, and that despite minor variations it is in general use. This finding is based in part upon the minutes of the Association and also on the testimony of a witness to the effect that it had been continued by mutual consent. "We think the artificiality and arbitrariness of the zone structure is so apparent it can not withstand the inference of agreement." Fort Howard Paper Co. et al. v. Federal Trade Commission, supra, 156 F.2d at page 907.

The Commission found that uniform quantity discounts had been adopted concertedly, were in general use with variations, and were continued by agreement. This is based in part and sufficiently on minutes of the Association and inferences therefrom.

The Commission found that there was uniform though sealed bidding to the United States Government Printing Office, and that this was the result of agreement. This finding is buttressed by correspondence, the testimony of petitioner Allied's merchant-agent whose price cutting resulted in the petitioners' refusal to fill the order he had obtained, and the testimony of the Director of Purchases of the Government Printing Office.

The evidence with sufficient clarity involves all petitioners, although, of course, various items of evidence pertain to various petitioners. The respective petitioners are not relieved from liability as conspirators merely because they all did not take part in the same acts. American Tobacco Co. et al. v. United States, supra, 147 F.2d page 119.

▆▆▆ Here the petitioners are proved to have agreed upon these factors: uniform quantity discounts, uniform finishing differentials, uniform base prices, and a uniform zoning system with uniform zone differentials, all without regard to a particular petitioner's costs of production and distribution. The pattern clearly provides a means of fixing uniform prices. The petitioners' temporary departure from their system or temporary inability to carry through their purpose does not affect its illegality. The petitioners' degree of success in stifling price competition is not the measure of their liability.

▆▆▆ It remains to consider whether there is substantial evidence to support the findings as to petitioner Consolidated. Consolidated contends, and the Commission does not deny, that because of inexpensive manufacturing by use of its patented process, it was able to sell its coated papers within the price range of the other corporate petitioners' uncoated papers. It contends, and the Commission does not deny, that it entered into such competition sharply, taking full advantage of its manifest competitive opportunity. Because of the unusual manufacture and composition of Consolidated's coated papers, there was a prejudice against them, and this further dictated selling at prices sharply undercutting those of the other petitioners' coated papers. Despite this, the Commission seeks to uphold its findings as to Consolidated on the basis of the following evidence. We, of course, look only to it to see its substantiality and do not consider Consolidated's evidence or weigh the evidence.

Consolidated was a member of the Association, but the Commission expressly disclaims any contention of guilt by mere association. There is the testimony of

witness Mead to the effect that the other petitioners offered their coated papers in competition with Consolidated's coated papers during 1937. Mead further testified that during the period from June 1935 to April 1939, there were thirteen price changes of its coated papers by Consolidated, two of which were made at the same time as another company in the industry made a similar change on both its coated and uncoated papers.

Mead also testified that Consolidated in many respects applied the industry's trade customs for uncoated papers in regard to Consolidated's coated papers, although its costs might be greater as to finishing differentials, and its price lists so stated. Moreover, Consolidated trimmed four sides of its higher grades of coated papers without an additional penalty, as was done by the other petitioners with their coated papers.

Finally, the Commission relies on the fact that although Consolidated used a zoning system, which divided into two parts the area in the other petitioners' Zone 1 (where 95% of Consolidated's output was sold) it did not vary its delivered prices accordingly from time to time during the complaint period.

Consolidated's scheme was to compete with the other petitioners by offering its coated papers within the other petitioners' uncoated papers price ranges. In doing this, it adopted the latters' trade customs for uncoated papers—to meet competition. Incidental facts, such as the two coincident price changes and its varying from its own zoning system, cannot make out the pattern of conspiracy found. Without referring again in detail to the finding of a total combination and conspiracy and the findings of the several agreements and concerted activities of the petitioners, it is clear to us that this evidence is not substantial, and we hold that the findings as to Consolidated cannot be sustained.

The order to cease and desist as to all the petitioners but Consolidated is supported by the evidence and the findings and will be enforced; as to Consolidated, it must be vacated.

It is so ordered.