**NATIONAL MACARONI MANUFAC-
TURERS ASSOCIATION, et al.,
Petitioners,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

**No. 14713.**

United States Court of Appeals
Seventh Circuit.

April 13, 1965.

Edward H. Hatton, Howard R. Barron, Sidney G. Saltz, Chicago, Ill., for petitioners. Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel.

J. B. Truly, Asst. Gen. Counsel, Alvin L. Berman, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, Gen. Counsel, J. Richard Carr, Atty., for the Federal Trade Commission.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

HASTINGS, Chief Judge.

This case is before us on petition of National Macaroni Manufacturers Association (Association), its officers and member manufacturers of macaroni [1] and spaghetti products (petitioners), to review an order of Federal Trade Commission (Commission), respondent.

The order under review requires petitioners, in or in connection with the manufacture, sale or distribution, in commerce, of macaroni and related products, to cease and desist from entering into or carrying out any planned common course of action, understanding or agreement between any two or more of said petitioners (respondents below) or between anyone or more of said petitioners and others not parties hereto, to do or perform any of the following acts or things:

"Fix or establish the kinds or proportions of ingredients to be used in producing macaroni and related products, or take any other concert-

1. The term "macaroni" or "macaroni products" refers to and includes maca-
roni, spaghetti, noodles and related products.

ed action, for the purpose of fixing or manipulating the price of such ingredients."

It is undisputed that the goods in question moved in commerce as "commerce" is defined in the Federal Trade Commission Act.

The complaint in this proceeding was issued by Commission on August 2, 1962. It charged Association, its officers and member manufacturers of macaroni and spaghetti products, with having acted collectively to suppress, lessen and eliminate competition in the manufacture, sale and distribution of such products and to fix or rig the prices of durum wheat, semolina and durum flour, all in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a) (1).[2]

The complaint charges, in essence, that the principal domestic manufacturers of macaroni products, acting through Association, entered into and carried out agreements and understandings to fix and determine the quality of macaroni products to the end that durum millers would offer a blend of durum and other types of wheat rather than 100% durum, and that the macaroni manufacturers would use this blend.

It was further charged that petitioners did so for the purpose of depressing the price of durum wheat and preventing its price from being established in the open market by free competition, the effect being to eliminate quality competition in macaroni products.

Petitioners generally denied the allegations of the complaint.

After full evidentiary hearings, the hearing examiner rendered his initial decision upholding the complaint and entering an order to cease and desist. On appeal, Commission concluded that the findings of fact and conclusions of law entered by the hearing examiner were correct, but modified his cease and desist order in minor respects. Commission filed a brief memorandum opinion in support of its order.

On this review, petitioners urge that Commission erred in holding that they had the design or purpose to depress the price of their basic raw materials (durum wheat); that petitioners' response to a shortage in the durum wheat crop was a reasonable attempt to cope with the shortage; and that Commission erred in holding their action to be an agreement, rather than a mere suggestion for voluntary action.

■ In short, the critical question before us is whether the findings of Commission are supported by substantial evidence in the record.

From the record before us, the facts set out in the following narrative appear to be clearly established.

Association is a not-for-profit Illinois corporation. Its active membership consists of 84 of the 125 commercially important domestic manufacturers of macaroni and macaroni products. These 84 active members annually produce and sell macaroni products valued in excess of $100,000,000—70% of all such products sold in the United States.

The purpose of Association is to encourage the production of quality macaroni products. It gathers and disseminates information of importance to its members. It encourages the production and use of raw materials, particularly durum wheat, indispensable to high quality macaroni products.

It employs a full-time secretary, a research director and the services of a laboratory. It publishes a trade magazine, The Macaroni Journal. It organized and operates a separate corporation, National Macaroni Institute, to develop product promotion and consumer education. It set up a variety of committees to promote and improve the growth of durum wheat and to fight crop disease. It established a Standards Committee and a Trade Practices Rules Committee to work with

---

2. "(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

appropriate government agencies, including Federal Trade Commission.

Association holds meetings to exchange views on common problems of the industry, some of which are attended by durum wheat growers and the miller-suppliers of the active members. It is the only trade organization representing the industry.

Association's active members are in active competition with others competitive in the industry,[3] with others who produce and sell competitive products and with each other.

Macaroni products are manufactured from dry dough made from semolina (middlings of durum wheat in granulated form with a tolerance of 3% flour), durum flour (powder form of durum wheat), farina flour (powder form of any hard wheat other than durum) or any combination of these.

The highest quality macaroni products are made from 100% semolina and such products have the best consumer acceptance of all macaroni products. Manufacturers in the industry prefer to use 100% durum because it is easier to work with and results in a higher quality product with superior cooking tolerances and color. To reduce the durum content of a macaroni product results in an inferior product of lower quality. However, at times macaroni manufacturers engage in some blending and others use farina regularly.

Durum wheat is largely grown in parts of the states of North Dakota, South Dakota, Minnesota and Montana. Also, in western Canada and certain European countries. It commands a premium price over other classes of wheat. It is a spring crop harvested in the latter part of August. It is traded on the Minneapolis Grain Exchange, where supply and demand factors operate to establish price levels.

Growers of durum wheat and grain merchants who buy from growers constitute the supply factor. Manufacturers, millers and exporters constitute the demand factor. Nearly all of the durum wheat ground in this country is ground by seven mills in the Minneapolis, Minnesota area. These mills are associate members of Association.

Over the past ten years the demand for durum has stemmed almost entirely from domestic manufacturers in the industry, except in the years 1956–57, 1960–61 and 1961–62, when there was an export demand. It is estimated that Association members buy about 70% of the output of the durum mills.

There was a crop shortage of durum in 1953 as the result of crop damage. At an industry durum conference in Chicago, Illinois on August 13, 1953, sponsored by Association, the members adopted a resolution to the effect that durum millers would not make 100% semolina available to any buyer after August 14 (except to fulfill existing contracts), but would offer instead a 50-50 blend of semolina and farina (hard wheat). Some manufacturers objected on the ground that blending durum wheat should be their own prerogative.

Following this resolution, 100% semolina went off the market in 1953 and the 50-50 blend became the best product available. This situation continued until June, 1956, when another Association sponsored conference, because of improved crop conditions, resolved to discontinue the use of blends.

The reports of industry policy in The Macaroni Journal during the 1953–56 interval made clear that exporters had entered the open market and purchased durum supplies at prices higher than American millers were willing to pay; that there was a limit to how much premium the industry manufacturers could and would pay for durum; that if

---

3. Important manufacturers of macaroni and macaroni products, not members of Association, include Quaker Maid Division of Great Atlantic & Pacific Tea Company, Grocery Store Products, Kraft Foods, Campbell's Soup, H. J. Heinz, Butoni Macaroni Company and Vimco.

Association members had not taken such action the prices of durum would have skyrocketed; that the members thought a uniform product from the durum mills (50-50 blend) would give the industry greater stability in quality and price; and that the industry would revert back to the use of 100% durum when durum wheat would sell at not too great a premium over breadwheats.

After the June, 1956 Association sponsored industry conference, the industry went back to the 100% durum standard and continued thereon until August, 1961.

In the spring of 1961, it became apparent that a lack of moisture was leading to a drought situation and that there would be a short crop of durum wheat in the 1961–62 harvest. Similar crop shortages were experienced in foreign countries.

The Journal reported in January, 1961 that Italy had purchased substantial amounts of American and Canadian wheat. The May, 1961 Journal reported substantial sales in March to France and Germany. The June, 1961 Journal reported the export sale of 2,000,000 bushels, as well as the complete sellout of Canadian durum from the 1960–61 crop. In June 1961, exporters bought 6,000,000 bushels of durum wheat from the Commodity Credit Corporation.

At Association's July, 1961 annual meeting, the shortage of durum was discussed and the importation of some 5,-000,000 bushels of Canadian durum from the 1961–62 crop was considered. (This wheat was not imported.) A resolution was adopted asking the Secretary of Agriculture to curtail further exports of durum, stating that the domestic market might "be forced to use wheats of inferior quality other than durum, thereby placing the domestic macaroni industry at a competitive disadvantage to imported products made with 100% durum semolina."

The Secretary of Agriculture rejected this resolution explaining that this request "would unnecessarily discriminate against the producers of durum wheat and adversely affect their markets."

At the July, 1961 meeting, it was agreed that an industry meeting of growers, millers and manufacturers would be held in August. The Journal reported this meeting would be held in Minneapolis "after final harvest information is available to determine the course of industry action."

The Association sponsored meeting was held on August 15, 1961. It was attended by millers, growers, manufacturers and others interested in the industry. The crop situation, the July, 1961 durum carry over, additional current sales for export and the probable available supply of durum in the 1961–62 crop year were discussed.

A milling company official, a Mr. Von Blon, outlined several alternatives in view of the prospective crop shortage. The millers and manufacturers could continue to use 100% durum which would gradually deplete the available supplies and lead to the payment of "astronomical prices." They could cease using durum altogether with a resulting sales loss because of consumer prejudice against inferior products. Finally, the industry could switch to a 50-50 durum and hard wheat blend, which would "provide the best products available to macaroni manufacturers this year, but will minimize price fluctuations for raw materials." He said, "The more we can spread out the buying of durum wheat, the better the possibility that the fluctuation in the price of durum wheat will be held within reasonable limits." He concluded by requesting the macaroni manufacturers present to provide the millers with an "expression of opinion."

The manufacturer-members of Association then met separately and adopted a resolution that:

"Effective September 1, durum millers should offer a blend of 50% durum and 50% other types of wheat whose characteristics most closely resemble durum and that macaroni manufacturers should use this 50-50

blend to maintain the highest quality possible to best utilize the available supply of durum during the current crop year."

Thereafter, most of the manufacturers followed the course outlined in the foregoing resolution, although a few did not. The amount of 100% semolina sold domestically after August, 1961 was negligible. Some semolina was available in October, 1961, but little was sold because of the high price.

During the crop year 1961–62, approximately 14,000,000 bushels of durum were milled for domestic use, a drop of some 9,000,000 bushels from the preceding crop year. Total purchases of durum by exporters during 1961–62 approximated 16,000,000 bushels. At the end of crop year, June 30, 1962, there was a domestic durum carry over of 5,000,000 bushels. Thus, by failure to use the carry over and to compete in the export market, the mills failed to use about 21,000,000 bushels of available durum wheat during the 1961–62 crop year.

From all of this the Commission found that with the background of petitioners' arrangements and activities in 1953, followed by their course of action taken in 1961, the action taken in fixing the composition of macaroni products was clearly the result of agreement. It found that the agreement was intended to ward off price competition for durum wheat in short supply by lowering total industry demand to the level of the available supply. It found that since the macaroni industry is the only market for durum, and since the parties to this agreement dominate the domestic macaroni industry, that the agreement actually affected in a substantial degree the price of durum wheat during the period the agreement was in effect.

■ Commission concluded that "where all or the dominant firms in a market combine to fix the composition of their product with the design and result of depressing the price of an essential raw material, they violate the rule against price-fixing agreements as it has

been laid down by the Supreme Court." We agree.

We have carefully examined the record which further supplements the foregoing narrative and the findings of the hearing examiner as accepted by Commission. We need not further detail the facts here.

The standards governing a judicial review of Commission's decision are well established and limit the scope of our review in this and similar cases. We find no unusual circumstances in the instant matter to sanction any departure therefrom.

■ Findings of fact by Commission, including whether petitioners engaged in a price-fixing agreement, if supported by substantial evidence, are conclusive. National Lead Company v. Federal Trade Commission, 7 Cir., 227 F.2d 825, 832–833 (1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); Fort Howard Paper Co. v. Federal Trade Comm., 7 Cir., 156 F.2d 899, 906–907 (1946), cert. den. 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680; Phelps Dodge Refining Corp. v. Federal Trade Comm., 2 Cir., 139 F.2d 393, 395 (1943).

■ The weight to be given to the facts and circumstances, as well as the inferences reasonably to be drawn therefrom, is for Commission. Federal Trade Comm. v. Pacific States Paper Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534 (1927); Independent Grocers Alliance Dist. Co. v. Federal Trade Comm., 7 Cir., 203 F.2d 941, 945 (1953); Fort Howard Paper Co. v. Federal Trade Comm., supra, 156 F.2d at 907.

■ Existence of a conspiracy or proscribed agreement need not be established by direct evidence. The agreement may be inferred or implied from the acts and conduct of the parties, as well as from the surrounding circumstances. National Lead Company v. Federal Trade Commission, supra, 227 F.2d at 832–833; Triangle Conduit & Cable Co. v. Federal Trade Comm., 7 Cir., 168 F.2d 175, 179–180 (1948), affirmed sub nom. Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed.

1110 (1949); Fort Howard Paper Co.* v. Federal Trade Comm., supra, 156 F.2d at 905; United States Maltsters Ass'n v. Federal Trade Comm, 7 Cir., 152 F.2d 161, 162 (1945).

We reject the contention of petitioners, as did Commission, that the 1961 action they took was not an agreement but was merely a suggestion to Association members. It is well settled that the possibility of drawing either of two inconsistent inferences from the evidence does not prevent Commission from drawing one of them. If such an inference or finding is supported by substantial evidence, we are not free to set it aside even though we might have drawn a different inference. National Labor Relations Board v. Southern Bell Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943); National Labor Relations Board v. Nevada Consol. Copper Co., 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305 (1942).

The Supreme Court has held "that price fixing is contrary to the policy of competition underlying the Sherman Act [4] and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices." United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309–310, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956). The combination found in the instant case is illegal per se. Id. at 310, 76 S.Ct. 937; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–222, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

We hold that under the record as a whole there is substantial support for the findings of Commission that the course of industry action entered into by petitioners, in combination, to unlawfully fix prices constituted a *per se* violation of Section 5 of the Federal Trade Commission Act.

In view of this holding, it would serve no useful purpose to further consider and cite additional authorities relating to variations or extensions of the rule laid down in United States v. McKesson & Robbins, Inc. supra.

It seems appropriate to note here that, in the instant case, Commission did not hold "that all efforts at product standardization, or all buying agencies or other cooperative buying arrangements, or all attempts to cope with scarcity or other conditions of economic dislocation, are unlawful under the antitrust laws."

It follows, therefore, that Commission's order under review will be approved and enforced. It is so ordered.

Order enforced.

---

4. Violations of the Sherman Act constitute violations of Section 5 of the Federal Trade Commission Act. Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 690, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).