**The ATLANTIC REFINING COMPANY, a Corporation, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 15745.

United States Court of Appeals
Sixth Circuit.

April 12, 1965.

---

**600**

Harold F. Baker, Washington, D. C. (Edward F. Howrey, Robert W. Steele, Washington, D. C., on the brief; Howrey, Simon, Baker & Murchison, Washington, D. C., Roy W. Johns, Joel L. Carr, Philadelphia, Pa., of counsel), for petitioner.

Alvin L. Berman, Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. General Counsel, Alvin L. Berman, Richard Campbell Foster, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before PHILLIPS and EDWARDS, Circuit Judges, McALLISTER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

Our problems with this petition would be considerable if the United States Supreme Court had not recently grappled with and decided the major questions which confront us. In Simpson v. Union Oil Co. of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) the Supreme Court held that employment by a major gasoline company of consignment agreements with gas station owners to fix retail prices of gasoline represented violations of the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C. §§ 1 and 2. The opinion by Mr. Justice Douglas, joined by four other members of the Court, limited the protection of such agreements (which Union Oil Co. and our present appellant had found in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926)) to situations where the protected consignment agreements pertained to products on which the consignor held patent rights. Petitioner here holds no such patent rights.

In the instant case a three-count complaint was filed against petitioner Atlantic Refining Company by the Secretary of the Federal Trade Commission. The first count alleged Atlantic violated the Federal Trade Commission Act, 15 U.S.C. § 45, by coercing its lessee dealers into signing a "temporary consignment contract" to sell at a single and noncompetitive price set by Atlantic. Counts 2 and 3 were conspiracy counts. Count 2 charged a conspiracy to fix prices applicable to the temporary consignment contract with lessee dealers and Count 3 charged a conspiracy between Atlantic and its independent wholesale distributors to maintain Atlantic's uniform resale price by the granting to the distributors of certain allowances or rebates which they were to pass on to their own dealer customers who had agreed to adhere to Atlantic's resale price.

The Hearing Examiner having found that the complaint was sustained only as to Count 3, and having recommended a cease and desist order as to it, appeals were taken by both parties to the full

Commission. There the appeals were heard by three Commissioners. A majority of two reversed the Hearing Examiner as to Counts 1 and 2 and entered cease and desist orders as sought by the complaints in relation to all three counts.

The relevant facts as found by the Commission are as follows:

"The respondent is a Pennsylvania corporation, primarily engaged in the production, sale and distribution of gasoline and other petroleum products throughout a 17-state marketing area. Its 'regular' gasoline is sold under the brand name 'Atlantic,' and its high test fuel under the name 'Imperial.' Respondent owns and operates refineries at Philadelphia, Pennsylvania, and Atreco, Texas. In 1956 its gross domestic sales of petroleum and chemical products, including sales of its consolidated subsidiaries, amounted to approximately $379,000,000.

"The respondent markets its gasoline in two ways. It sells directly to the operators of retail gasoline service stations who either own and operate their own stations, or lease the premises from the respondent or others. The second marketing system entails sales to wholesale distributors who in turn resell to retail service station dealers. In the geographic area with which the facts of this case are concerned, respondent used both systems.

"The controversy in this case centers chiefly in an area referred to by the examiner as the 'Delmava Peninsula.' As a glance at the map will show, the Delmarva Peninsula is that body of land which separates the Chesapeake Bay from the Delaware Bay and Atlantic Ocean. It acquires its name from the fact that it lies within the boundaries of the States of Delaware, Maryland and Virginia. In 1957 a gasoline price war erupted on the Peninsula. The allegedly unlawful acts and practices of this respondent were performed in connection with this price war.

"The practices engaged in by the respondent in the Delmarva price war were not spur of the moment expedients but constituted the implementation of predetermined company policy. The respondent states 'under price war conditions it is the policy and practice of respondent to assist its retail dealers to remain in business. It is likewise the policy and practice of respondent to assist its distributors in order that they may, in turn, sell to their retail dealers at a price which allows such retail dealers to be generally competitive and thus not suffer economically and competitively or be forced out of business.'

\*     \*     \*     \*     \*

"Since, as aforesaid, the respondent utilized two methods of distribution, their 'assistance' to dealers in a price-war area, was accomplished in different fashions. As alleged in Counts I and II of the complaint, on direct sales to retail service stations, the respondent utilized temporary consignment contracts. This procedure was devised and implemented by the company in early 1956. It provided: 'When price war conditions prevail in a given competitive trade area so that the spread between the dealer [tank wagon] price of Atlantic gasoline and the prevailing service station price at comparable service stations is less than 4¢ per gallon, all Atlantic dealers \* \* \*' will be offered the opportunity to 'execute a contract sales agreement and become our contractors for the retail sale of Atlantic-owned gasoline.'

\*     \*     \*     \*     \*

"There is no dispute concerning the basic details of the consignment program. The hearing examiner succinctly explains it \* \* \* in the following terms:

" '1. The Company will place gasoline on consignment with the dealer subject to prior approval by the Credit Department. At

the time of each replenishment delivery, the volume of gasoline on consignment is to be brought to its original level. The dealer will settle in cash at the time of replenishment for the number of gallons equal to the replenishment delivery on the basis of Atlantic's posted service station price at the time at which the gasoline was sold, less a commission for Atlantic gasoline, representing 23% of the service station price for the product, excluding all taxes.

" '2. Atlantic will specify the service station price of gasoline posted by the dealer during the period of the consignment plan agreement, the dealer to be trustee of proceeds of sale.

" '3. Title to gasoline constituting any replenishment delivery shall not pass to the dealer.'

"The record reveals that respondent entered consignment agreements with 37 of its dealers in its area number 4 during 1957 and 1958. Two of these dealers were located in Maryland and the remainder in Delaware. Although the price war was over in Sussex County, Delaware, by September 13, 1957, dealers in that County remained under the consignment program until as late as September 1958. The price war continued for a longer time in Newcastle and Kent Counties in Delaware, and thereto the consignment agreements remained in effect during 1958.

"There can be no doubt but that respondent, through the operation of this consignment program as above described was able to, and did, in fact, fix uniform retail prices for gasoline sold to consumers by its lessee-dealer service stations in its areas 1, 2, 3 and 4, located on the Delmarva Peninsula. But in order to maintain the prices established by the respondent through the consign-ment program, it was necessary to secure the compliance of these dealers who did not buy directly from respondents but through an intervening wholesale distributor. Respondent's announced policy on pricing is:

" 'There will be only one retail price at all times in any given pricing area. This will be called Atlantic's posted retail price.

" 'A reasonable relationship will always be maintained between posted retail price, posted dealer tank wagon price, and posted consumer tank wagon price.'

"Since the dealers buying from a wholesale distributor were his customers and not those of the respondent, control over their prices could only be maintained and secured by enlisting the cooperation of the wholesale distributor who served them. The hearing examiner found that the respondent did secure the cooperation of its sometimes unwilling distributors, and thereby conspired with them to fix prices as charged in Count III of the complaint and in violation of Section 5 of the Federal Trade Commission Act.

"The system pursued was to grant the wholesale distributor a lower price to enable him to in turn sell at a lower price to such dealers as would maintain the consumer price set and fixed by respondent for its direct buying dealers operating under the consignment plan. The simple mechanics of the pricing procedure utilized are explained in an Atlantic bulletin to its district managers, as follows:

" 'A fictitious dealer tank wagon price will be computed by using the retail price, excluding tax, that we have established on contract sales operation less 23%. For example, if we are on contract sales operation at 26.9, the fictitious dealer tank wagon price for use by the distributor would be 13.8.

This is the price which we would expect distributors to charge their dealers within the area where we are on contract sales operations.

\* \* \*'

"If a wholesaler sold to a dealer at the 'fictitious dealer tank wagon price' under certain conditions prescribed and enforced by the respondent, he would, upon application to respondent, be rebated two-thirds of the difference between the price he charged the dealer and what would be a normal dealer price. He was required to absorb the remaining one-third. The conditions prescribed by the respondent for a wholesaler to meet in order to secure his rebate, were:

"(1) They must sell the fictitious or reduced dealer tank wagon prices to those retail dealers located in a depressed or price-war area.

"(2) They must furnish respondent evidence of such sale in an application for the rebate on forms previously supplied to them by the respondent. On these forms they must indicate the dates, gallonage sold and list the dealers to whom they gave the rebate.

"(3) Upon receipt of the forms, the respondent calculated the amount of the rebate and remitted to the distributor, but only for the number of gallons sold to those dealers who had resold at respondent's fixed retail price established for its consignment lessee-dealer stations. The distributor had to sustain the full loss for sales to those dealers for whom the respondent disallowed the rebate.

"The way in which respondent's pricing plan worked with distributors is indicated by the experience of the Atlantic Oil Company of Georgetown, Delaware, one of respondent's distributors in Sussex County, Delaware. Charles B. Marsh, the witness representing this distributor, testified that the company had around 18 dealer customers. During the price wars in Sussex County in 1957, respondent assisted the Atlantic Oil Company in aiding the latter's dealers by granting refunds (in effect a lower tank wagon price) on sales. Atlantic Oil Company sold its dealers at a reduced price and in turn applied to the respondent for refunds based on the dealer assistance.

"These compensatory refunds were granted by the respondent to Atlantic Oil Company on the understanding, the evidence shows, that the distributor would lower its prices to dealers and that the dealers in turn would post pump prices suggested by the respondent.

"Mr. Marsh testified that J. White, an employee of respondent, checked on the pump prices of Marsh's dealers and reported this information to Marsh. This same employee also accompanied Marsh on inspection tours of Marsh's dealers. At such times White asked the dealers to raise their prices to the figure recommended by respondent. Most of Marsh's dealers posted uniform pump prices during the 1957 price wars but there were four notable hold-outs. These were: Bunting, Frankfort, Delaware; Burton, Georgetown, Delaware; R. J. Campbell, Frankfort, Delaware; and McGee & West, Somerville, Delaware. When these dealers refused to sell at the pump prices specified by respondent, Atlantic Oil Company was denied compensatory refunds on transactions with them. This is revealed by the testimony as well as documentary evidence.

"Various employees of respondent, such as Mr. White and Mr. Hughes, contacted Witness Marsh about the four nonconforming dealers and insisted that they raise their prices.

Mr. White recommended as possible action against these dealers, if they refused to conform to the recommended prices, that Marsh take out their pumps and insignia. Marsh was also threatened with the loss of his franchise if he did not bring these dealers into line. Mr. Zinn, District Sales Manager of respondent, requested from Marsh and received the contracts that this distributor had with such dealers. Mr. Marsh testified that the explained purpose of obtaining the contracts was to see if they could be broken. However, no such action was taken. The four recalcitrant dealers all thereafter raised their prices, although some did this only as a temporary measure and shortly returned to their prior prices."

It does not appear that petitioner disputes the accuracy of this factual background. But it certainly does dispute the principal conclusions drawn therefrom.

The Commission's chief conclusion was stated thus:

"It is apparent from the facts that respondent very clearly desired to stifle price competition among Atlantic dealers and it sought the complete control of Atlantic retail prices in the price war area. Respondent utilized the consignment system of marketing as a device to control prices admittedly to avoid the impact of the Clayton and Sherman Acts. Doubtless the respondent felt that it had devised a consignment program valid in that it met all of the criteria of consignment as prescribed in the law of agency and it may well be that for purposes other than anti-trust law enforcement this consignment program could be upheld. But, as here employed, to effect and participate as an integral unit of a horizontal and vertical price fixing scheme, the respondent's consignment program must be held as a violation of the Federal Trade Commission Act."

As we have noted, the Commission entered cease and desist orders as to the practices alleged in all three counts of the complaint.

Before this court the petitioner attacked the conclusion set forth above, claiming that its consignment plan was a good faith and wholly legal marketing method, and not, as found by the Commission, an integral part of an overall illegal plan to fix and maintain prices.

Basically petitioner's argument on this score we read as seeking to restore vitality to United States v. General Electric Co., supra. As such this argument must plainly be addressed not to this court, but to the United States Supreme Court in an argument which seeks the overruling of Simpson v. Union Oil Co., supra.

This effort may prove to be rather a formidable undertaking, since, as is true so often of that Court, a trend toward the Union Oil holding had been plainly foreshadowed (as the Federal Trade Commission's opinion in the instant case demonstrates) by such cases as United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), and United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

And the opinion of the Court in Union Oil seems definitive as to the principal argument at issue pertaining to whether consignment agreements may be used by a producer to fix and maintain retail prices:

"Consignments perform an important function in trade and commerce, and their integrity has been recognized by many courts, including this one. See Ludvigh v. American Woolen Co., 231 U.S. 522 [34 S.Ct. 161, 58 L.Ed. 345]. Yet consignments, though useful in allocating risks between the parties and determining their rights *inter se*, do not

necessarily control the rights of others, whether they be creditors or sovereigns. Thus the device has been extensively regulated by the States. 22 Am.Jur., Factors, § 8; Hartford [Accident &] Indemnity Co. v. [People of State of] Illinois, 298 U.S. 155 [56 S.Ct. 685, 80 L.Ed. 1099]. Congress, too, has entered parts of the field, establishing by the Act of June 10, 1930, 46 Stat. 531, as amended, 7 U.S.C. § 499a et seq., a pervasive system of control over commission merchants dealing in perishable agricultural commodities.

"One who sends a rug or a painting or other work of art to a merchant or a gallery for sale at a minimum price can, of course, hold the consignee to the bargain. A retail merchant may, indeed, have inventory on consignment, the terms of which bind the parties *inter se*. Yet the consignor does not always prevail over creditors in case of bankruptcy, where a recording statute or a 'traders act' or a 'sign statute' is in effect. 4 Collier, Bankruptcy (14th ed.), pp. 1090–1097, 1484–1486. The interests of the Government also frequently override agreements that private parties make. Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy. Thus a consignment is not allowed to be used as a cloak to avoid § 3 of the Clayton Act. See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 353–356 [42 S.Ct. 360, 66 L.Ed. 653]; cf. Straus v. Victor Talking Mach. Co., 243 U.S. 490, 500–501 [37 S.Ct. 412, 61 L.Ed. 866]. Nor does § 1 of the Sherman Act tolerate agreements for retail price maintenance. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–222 [60 S.Ct. 811]; United States v. Parke, Davis & Co., supra.

\* \* \* \* \*

"Dealers, like Simpson, are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. The risk of loss of the gasoline is on them, apart from acts of God. Their return is affected by the rise and fall in the market price, their commissions declining as retail prices drop. Practically the only power they have to be wholly independent businessmen, whose service depends on their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by Union Oil. By reason of the lease and 'consignment' agreement dealers are coercively laced into an arrangement under which their supplier is able to impose noncompetitive prices on thousands of persons whose prices otherwise might be competitive. The evil of this resale price maintenance program, like that of the requirements contracts held illegal by Standard Oil Co. [of California and Standard Stations] v. United States, supra [337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371], is its inexorable potentiality for and even certainty in destroying competition in retail sales of gasoline by these nominal 'consignees' who are in reality small struggling competitors seeking retail gas customers." Simpson v. Union Oil Co., supra, 377 U.S. at 17–18, 20–21, 84 S.Ct. at 1055, 1056–1057 (1964). (Footnotes omitted.)

This case deals with the same industry and a parallel employment of a consignment agreement by Union Oil. The case, however, had a different origin. It was a suit for treble damages under § 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15, for violation of §§ 1 and 2 of the Sherman Act, supra.

■■ The courts have construed the Federal Trade Commission Act as being "in *pari materia*" with the Sherman and Clayton Acts. Menzies v. Federal Trade Commission, 242 F.2d 81 (C.A.4, 1957),

cert. denied, 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed.2d 908 (1957). This construction allows for using cases decided under any of the antitrust laws in dealing with cases brought by the Commission. Federal Trade Commission v. Beech-Nut Packing, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Federal Trade Commission v. Motion Picture Adv. Service Co., 344 U.S. 392, 394–395, 73 S.Ct. 361, 97 L.Ed. 426 (1953). The fact that Simpson v. Union Oil Co., supra, was a suit for treble damages under the Sherman and Clayton Acts does not weaken its application to the case at hand.

There are, however, two distinctions between the fact situation in Union Oil and this case involved. First, it is clear that Union Oil applied its system coercively to Simpson because they refused to renew a lease to him solely because he sold gasoline below their fixed price. In the instant case petitioner claims that there is no showing of "coercion." Second, in Union Oil, consignment agreements were the standard practice under which the company operated, while in the Atlantic situation the consignment agreements were to go into effect only during a price war.

As to both of these issues the petitioner in this review must overcome adverse findings by the Federal Trade Commission. The statute which authorizes our review, 15 U.S.C. § 45(c), provides: "[T]he court * * * shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission." It also provides that the "findings of the Commission as to the facts, if supported by evidence, shall be conclusive." And the Supreme Court has held that "The weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn from them is for the Commission." Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927).

As to the distinctions pertaining to coercion and to the fact that Atlantic only used its consignment policy temporarily during price wars, whereas Union Oil's consignment policy was permanent in operation, the Commission's opinion commented:

"It is important to note that the company's program as planned and implemented, did not entail forcing dealers, including lessee-dealers, operating on company-owned premises, to execute the consignment agreements but under the circumstances, such overt control was unnecessary. Any dealer faced with a price-war situation was offered the consignment program or nothing. In other words, the company would not reduce its prices to him to enable him to independently set his own resale price and thereby meet competition as he saw fit. He was offered, in effect, 'Hobson's Choice' of continuing to buy at the normal dealer price, entering a consignment agreement, or terminating all existing contractual relations with the respondent. As several of the dealer-witnesses testified, it was a case of either signing the consignment contract or going out of business. Respondent argues that the only coercive force present in the situation was engendered by the price war market conditions, which the record shows it did not create. But this is no answer. One cannot justify offering a hot poker to a drowning man by averring that the water was to blame. To the extent that the lessee-dealers had no alternative but economic death to entering a consignment agreement with respondent, it must be found that they were pressured or coerced to enter such contracts and the hearing examiner's finding to the contrary is in error. However, there does not appear to be any evidence in this record that the respondent used its position of economic power over its lessee dealers to force them into entering the contract. Under the business conditions which existed, such pressure was unnecessary."

It appears plain to us that Atlantic's policy was the maintenance of one posted retail price at all of its retail outlets. And the fact that it applied its consignment agreement only to price wars simply underlines the fact that this was indeed, as found by the Commission, a price-fixing mechanism.

On the coercion issue it seems to us that this record affords "substantial evidence" to support the inferences found by the Commission. Standard Distributors v. Federal Trade Commission, 211 F.2d 7, 12 (C.A.2, 1954), rehearing denied, 211 F.2d 16 (1954); Federal Trade Commission v. Pacific States Paper Trade Association, supra. When Atlantic establishes a policy of refusing to change its wholesale price to meet the competition confronting its distributors and offers them only the choice of economic disaster or the consignment agreement, it has, indeed, offered a "Hobson's Choice." We agree with the Commission that no valid distinction between the consignment practices condemned in Union Oil and those shown here may be found on this record.

As to other issues presented by petitioner, we can be more succinct. The rules of the Federal Trade Commission since its inception have provided for decision by the majority of panels of three members.[1] We believe this rule is within the Commission's power to make and is wholly valid. Drath v. Federal Trade Commission, 99 U.S.App.D.C. 289, 239 F.2d 452 (1956), cert. denied, 353 U.S. 917, 77 S.Ct. 666, 1 L.Ed.2d 664 (1957).

The record amply supports the conclusions of the Commission that Atlantic was engaged in interstate commerce and that its consignment policy was a company policy, nationally conceived and applied.

Since the relief contemplated by this order consists of cease and desist orders which can be applied only prospectively after determination of their validity, we see no need to grapple now with the question as to whether Simpson v. Union Oil Co., supra, should be applied retroactively.

The order and opinion of the Federal Trade Commission is affirmed. An order for enforcement may be presented.

---

1. "A majority of the members of the Commission constitutes a quorum for the transaction of business." 16 C.F.R. 1.7.