**SUN OIL COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 14503.**

United States Court of Appeals
Seventh Circuit.

Aug. 19, 1965.

Leonard Emmerglick, Washington, D. C., Henry A. Frye, Richard L. Freeman, Philadelphia, Pa., Edward A. Groobert, Washington, D. C., for petitioner; Pepper, Hamilton & Scheetz, Philadelphia, Pa., Perlman, Lyons & Emmerglick, Washington, D. C., of counsel.

J. B. Truly, Asst. Gen. Counsel, Alvin L. Berman, Atty., James McI. Henderson, Gen. Counsel, Richard Campbell Foster, Atty., F. T. C., Washington, D. C., for respondent.

Before SCHNACKENBERG and KILEY, Circuit Judges, and GRANT, District Judge.

GRANT, District Judge.

On November 8, 1957, the Federal Trade Commission (Commission) issued its complaint against the Sun Oil Company (respondent or Sun), a corporation, charging it with unfair methods of competition and unfair acts and practices in violation of § 5 of the Federal Trade Commission Act (Act), 38 Stat. 719, as amended, 15 U.S.C. § 45 (1964 ed.).[1] Thereafter, on April 7, 1959, the Commission granted the motion of counsel supporting the complaint to amend same by adding a second count charging an additional violation of § 5 of the Act. As amended, Count I of the complaint alleged that an agency consignment agreement between Sun and its dealers was a fiction and subterfuge, and in fact was an agreement or combination to fix the resale prices of gasoline. Count II alleged that, assuming such consignment agreement created a valid agency, Sun engaged in a predatory pricing practice for the purpose of destroying competition or competitors, with the effect of unduly restraining and lessening competition. The hearing examiner, on May 17, 1962, entered an order directing Sun to cease and desist from such practices as alleged and complained of in Count I. He further ordered the charges under Count II of the amended complaint dismissed, from which action no appeal was taken. Upon Sun's appeal, the Commission modified the initial decision to conform to the views expressed by the Commission and, as so modified, adopted that decision.[2] The Commission concluded:

Under these circumstances we hold that respondent's consignment plan was unlawful not because it did not constitute a genuine consignment

1. Section 5 provides in pertinent part:

(a) (1) Unfair methods of competition in commerce, and unfair * * * acts or practices in commerce, are declared unlawful.

* * * * *

(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair * * * acts or practices in commerce.

(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair * * * act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. * * * If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by [this Act], it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. * * * After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require * * *.

2. The examiner's proposed order would have applied to all products sold by Sun. Upon Sun's challenge to the scope of the order, the Commission limited it to gasoline. Also at the request of Sun, the Commission modified the order to except contracts entered into in conformity with the McGuire Act amendment of Section 5 of the Federal Trade Commission Act, 66 Stat. 632, 15 U.S.C. § 45(a) (2)–(5).

under the law of agency, but because the proof showed it to be a vertical and horizontal price fixing device in violation of the Federal Trade Commission Act.[3]

Accordingly, the Commission entered its final cease and desist order on November 22, 1963.[4] The case is now before this Court upon Sun's petition to review the Commission's order, pursuant to § 5(c) of the Act, 52 Stat. 113, 15 U.S.C. § 45(c) (1964 ed.). For reasons hereinafter set forth, we agree with the Commission and we affirm.

The facts in this case are not in substantial dispute. Respondent, Sun Oil Company, is a New Jersey corporation with its principal office and place of business located in Philadelphia, Pennsylvania. Respondent operates an integrated petroleum company engaged in the production, purchase and sale of crude oil, the refining of crude oil and its derivatives, and the sale and distribution of gasoline and other petroleum products in various states [5] of the United States and foreign countries. It is one of the nation's leading producers and marketers of gasoline and enjoys wide public acceptance. Sun has refineries in Pennsylvania and Ohio and markets its products through wholesale distributors, company owned and operated stations and inde-

pendent dealer stations. It distributes gasoline under the brand name "Blue Sunoco" through approximately 8,900 outlets in the United States and Canada, and its 1956 gross petroleum sales exceeded $731,000,000.

The market area involved in this proceeding is comprised of the metropolitan areas and surrounding contiguous territory of the cities of Norfolk, Portsmouth and Virginia Beach, Virginia (sometimes referred to hereafter as the Norfolk area). The period covered by the complaint is November, 1956, through April, 1959.

Present in the relative market area were several military exchanges selling major-brand gasoline at prices substantially below those prevailing elsewhere in the Norfolk area. In 1956 there were 12 such Navy exchange stations plus several other PX stations. They normally posted prices which were from four to five cents below the prevailing prices of major brands for regular gasoline. However, only authorized military personnel and their dependents could purchase at such exchange stations. With what the hearing examiner aptly described as a "universe" of approximately 100 million gallons of gasoline a year in the Norfolk area, the Navy exchanges accounted for

---

3. Sun's appeal was heard by a full complement of the Commission. Commissioner Anderson concurred in the result, believing that the opinion of the Commission should have given assurance that it was not attacking the general practice of consignment selling.

4. Sun was ordered to cease and desist from:

 1. Entering into, continuing, cooperating in, or carrying out any planned common course of action, understanding, arrangement, agreement, contract or conspiracy with any person or persons not parties hereto, to establish, fix, adopt, maintain, adhere to, or stabilize by any means or method, prices, terms or conditions of sale at which its gasoline is to be sold.

 2. Establishing, maintaining, continuing, cooperating in, or carrying out, or attempting so to do, any plan, policy, program, or any consignment policy in

combination with any other person or persons not parties hereto, for the purpose or with the effect of enabling respondent to establish or fix the prices, terms or conditions of sale at which its gasoline is to be resold by a dealer after purchase from respondent.

 Provided, However, that nothing herein contained shall be construed to limit or otherwise affect any resale price maintenance contracts which respondent may enter into in conformity with Section 5 of the Federal Trade Commission Act, as amended by the McGuire Act (Public Law 542, 82nd Cong., 2nd Session, approved July 14, 1952).

5. The states are in the general area east of Chicago. They include the New England and Middle Atlantic States, and Ohio, Michigan, Illinois, Indiana, Florida and West Virginia. Sun markets only to a minor degree in South Carolina and Georgia.

approximately 8 million gallons thereof during the relevant time period.

In addition to the Naval exchanges, in 1956 there were 21 private-brand stations in the area. They normally and customarily posted a price for regular gasoline two cents below the prevailing price at the stations of the major oil companies. During the period in question, the private-brand stations accounted for about 9 million gallons of the same universe.

As the hearing examiner found, the Norfolk area was an unstable market in which depressed prices occurred spasmodically. There were occasional price wars, and a price disturbance in one section, in time, usually would spread throughout the entire area.

Sun entered the gasoline market in the Norfolk area in 1946, marketing its gasoline exclusively through a wholesale distributor, Taylor Oil Company. Taylor sold Sun gasoline at prices equal to the lowest posted by the private-brand operators. As a result, the purchasing public did not think of Sun's gasoline as a major brand, and was accustomed to purchasing it at the same price level as the private brands.

In September, 1954, Sun took over the operation from Taylor. At that time Sun began to open its own stations, leased to independent dealers, and unlike its operation under Taylor, operated as a major, with its dealers and company-operated stations generally posting the prices prevailing at the stations of the other major oil companies. At the time Sun took over from Taylor, its sales of gasoline products constituted about 6 percent of the overall market.[6] Sun commenced operations with fewer stations[7] and sold at the same prices as majors. This resulted in a smaller share of the market as well as less gallonage per station than Taylor enjoyed.[8]

After taking over from Taylor and prior to November 5, 1956, Sun sold its gasoline to retail dealers, who were independent contractors operating filling stations. Sun and such independent dealers entered into contracts providing for the sale of gasoline and other petroleum products by Sun to the dealers, and also entered into leases of the stations from Sun to the dealers. The agreements required the purchase of specified minimum amounts of gasoline. The leases contained a specified base monthly rental plus an additional rent of one-half cent per gallon sold. The computation of the specified base rental was based upon Sun's estimate of the potential gallonage the station might be expected to sell. Such estimates (and hence such base rental figures) were in all instances substantially in excess of the actual gallonage achieved. At nearly every station the actual gallonage sold was approximately one-half of the estimated potential. As a result, the stated base rental in each lease was substantially in excess of what it would have been, computed on the basis of the actual gallonage, and substantially in excess of what a dealer could afford to pay.

The leases were for year-to-year periods. At the time of the execution of the original lease, and every three months thereafter, an amendment to the lease was executed, reducing the base rent to a figure in most cases slightly less than half of the base rent set forth in the lease. In the event that such a quarterly amendment to the lease was not entered into, the rent set forth in the original lease immediately became effective. As was found by the hearing examiner, this situation gave Sun a po-

---

6. Taylor's share of the market was approximately 7.4% in 1951, 6.5% in 1952, 7.0% in 1953, and 6.0% in September, 1954.

7. Taylor had 34 stations in July, 1954. In early 1955 Sun had 12–14 stations, but gradually increased the number to 29 by October, 1956.

8. In July, 1954, Taylor's 34 stations were averaging 21,272 gallons per month per station. In early 1955 Sun averaged 20,000 per month per station. However, as it increased the number of stations, the gallonage per station decreased.

In 1955, Sun accounted for only about 2.65% of the market. It advanced to 3.85% by 1956.

tential power of coercion over its dealers because, if a quarterly amendment was not executed, the rental immediately more than doubled, which would probably force the dealer out of business. This could occur if the dealer declined to execute such a quarterly amendment to the lease, or if Sun chose not to execute such an amendment for any reason, including lack of cooperation.[9]

During late October and early November, 1956, a localized price disturbance occurred in Norfolk on upper Hampton Boulevard in a few blocks' stretch near the seven military exchange stations clustered in that area at the Naval Base. Several major stations, namely, Cities Service, Esso, Pure, Shell and Texaco, posted prices three cents under the major price generally prevailing in the Norfolk area. There was one Sun station located in the same general neighborhood.[10]

On November 5, 1956, as a result of this price disturbance, Mr. Southard, Norfolk District Manager of Sun, called all of the Sun dealers to a meeting at his office. Southard explained the details of Sun's commission consignment plan to the dealers, pointing out to them the situation on Hampton Boulevard, the declining gallonage per station, the fact that Sun had not achieved a share of the market comparable to that enjoyed under Taylor, the need to be more competitive in price with the military exchanges and the private-brand stations. He also indicated the probable necessity in the near future of Sun's posting a price within one cent of the prevailing private-brand price and an intention of maintaining such a differential no matter how low the private brands might reduce their prices.

Southard explained to the dealers that under the consignment plan they would be company agents for the sale of gasoline only, the company would retain title to the gasoline, establish the prices to be posted, and pay the dealers a minimum

9. Such contractual arrangements have been noted here to illustrate the nature of the pre-existing relationship between Sun and its dealers. This relationship, in great part, led the hearing examiner to note that the bargaining between Sun and the dealers concerning consignment was conducted hardly as equals. However, the record in this case gives no indication, and the Commission did not find, that Sun ever used or explicitly threatened to use, with regard to its consignment agreements, its inherent power over Sun dealers through the quarterly amendments to the basic lease rentals and the contractual requirement to purchase a specified minimum amount of gasoline. For an important case involving this form of coercion, which is discussed below at some length, see Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

10. Except for the price disturbance on upper Hampton Boulevard, the prevailing major price in the Norfolk area was 30.9 cents, the prices at the military exchanges were 25.9 cents in Norfolk and 26.9 cents in Portsmouth, and the prevailing private-brand price was 28.9 cents. Although the price disturbance was limited to upper Hampton Boulevard, and had little if any effect on any of the Sun stations other than the one in that neighborhood, the nearest being approximately three miles away while the Sun stations in Virginia Beach were over 20 miles away, Sun advised the dealers that it intended to adopt the consignment plan throughout the entire Norfolk area and reduce the price to 27.9 cents, that posted by the other majors on upper Hampton Boulevard.

The hearing examiner found that Sun's area-wide reduction necessarily had the effect of spreading the price war throughout the entire area. Within a few days of the Sun reduction, the other major dealers met Sun's price and the private-brand operators reduced their prevailing price to 25.9 cents, attempting to restore the 2-cent differential. Prices continued to decline for several months. Each time that Sun and the other majors reduced their prices, the private brands in general posted a price two cents lower. However, in the latter part of March, 1957, the private brands apparently gave up the fight and posted one cent below Sun's prevailing prices. Shortly thereafter, in April, the prices at most Sun stations returned to the pre-price-war level of 30.9, and the private brands posted a price of 29.9.

commission of 4.5 cents per gallon.[11] This was 1.6 cents less than the 6.1 cent margin the dealers were then receiving. Thus, Sun gave its dealers the alternative of accepting commission consignment or continuing to purchase gasoline at the established tankwagon price (the posted price to dealers and commercial users) and posting whatever retail price they saw fit as independent dealers. But because Sun intended to reduce the posted price at its own stations and those which went on consignment to 27.9 cents, and the tankwagon price was 24.8 cents and was to remain unchanged, the dealers who rejected consignment and continued to post a price of 30.9 cents would be unable to achieve sufficient gallonage to survive, while those who met the price of 27.9 cents would realize a margin of only 3.1 cents per gallon, less than the 4.5 cent minimum commission offered by Sun. In other words, a Sun dealer not participating in the commission consignment arrangement not only would have to compete with the lower prices of other brands of gasoline, but also would be faced with the lower prices of Sun dealers on consignment. As Southard testified before the hearing examiner, a dealer who refused consignment might be required to sell at a loss to meet the prices of Sun's consignees.

All of the dealers in the Norfolk area, save one, accepted commission consignment on November 5, 1956. Mr. Williams, who owned his own station in Portsmouth, held out for nearly three months during which time he was required to pay the tankwagon price of 24.8 cents per gallon. Sun and the other major competitors in his neighborhood reduced the posted prices to 24.9 cents, at which price he would have netted one-tenth of a cent per gallon. Williams posted 29.9 cents, and necessarily sold little gas. On February 1, 1957, he too accepted commission consignment.[12]

It does not appear that respondent, Sun Oil Company, disputes this factual background. But it certainly does dispute

11. The proposed consignment agreement constituted a written amendment to the sales agreement. By its terms it purported to retain title to the gasoline in Sun, provided for deliveries of gasoline to the dealer upon consignment as an agent, Sun fixed the prices at which the gasoline was to be sold, and until August of 1957 the amendment contained a specified minimum commission after which time the minimum commission fee was to be set at the discretion of Sun. Sun purchased the gasoline already in the dealers' tanks. The gasoline in the tanks was measured each time the posted price was changed by Sun, and the dealers were required to account for that sold at the previous price.

Under this arrangement, the dealer was to act as a commission agent in the sale of gasoline although he remained an independent dealer in the sale of all other products and services. The dealers were required to segregate the funds from the sale of gasoline, but in fact never did so. All risk of loss or shortage was on the dealer. Collateral deposit agreements which the dealers previously had entered into as independent contractors to secure the payment of certain indebtedness were amended also to secure Sun for the payment of the consigned gasoline. The consignment agreements were terminable on five days' notice except for defaults which made them terminable upon 24 hours' notice.

12. Inasmuch as Williams was the only hold-out from Sun's offer of commission consignment, his experience and testimony was considered peculiarly important with regard to the question of the voluntariness of the dealers' acceptance of the plan. Actually, however, the testimony of Williams at the hearing shed little light on this issue. At one point he stated that he did not initially go on consignment because of a misunderstanding of certain details of the plan. Williams owned his own station and apparently was under the impression that, if he accepted consignment, his property would be subject to certain "holds or attachment(s)" by Sun. When finally informed that this impression was incorrect, he went on consignment. On the other hand, when asked whether he felt he had any choice when he eventually went on consignment in February, 1957, Williams stated he did not. Later he testified that he felt the owner of a business had the "privilege of putting the price", and then added that "when you put a price you certainly have to be in competition and if you can't beat them you have to join them."

the principal conclusions drawn therefrom. Sun has consistently contended that its commission consignment plan was a traditionally legitimate, bona fide marketing method, freely contracted, and designed to assist dealers and itself achieve better competitive status in a limited but unstable market area.

The Commission's chief conclusion was stated as follows:

\* \* \* (I)t is clear that on or about November 5, 1956, respondent and various or all of its dealers met and discussed arrangements for fixing and maintaining retail gasoline prices in the Norfolk area, and that a combination or conspiracy was organized to take action with respect to maintaining such prices. \* \* \*

Thus respondent's consignment contracts were not separately and individually negotiated with each of its dealers. Rather the dealers were called together in groups. Sun then acted as a necessary conduit and clearing house through which the dealers among themselves and in each other's physical presence could and did pledge to fix prices horizontally; Sun, in the presence of the dealers, pledged to fix prices vertically.

The dealers attending and participating in the meetings, at least tacitly, agreed among themselves and with respondent to the taking of specific action on the maintaining of retail prices in the market. \* \* (T)here is no doubt that Sun and its dealers wished and agreed to hold steadfastly to a uniform price line.

\* \* \* Sun \* \* \* did not content itself with unilateral vertical arrangements but instead joined its dealers in horizontal arrangements which wiped out any slight opportunity for independent market action through price variances of any of its retail dealers. \* \* \*

\* \* \* The consignment arrangement was a fiction and a subterfuge in that it was simply a device by which the unlawful price fixing arrangement was to be implemented.

The Commission finally concluded that respondent's consignment plan was "a vertical and horizontal price fixing device" which constituted "an unfair method of competition and unfair practice in violation of the Federal Trade Commission Act." We agree and we affirm.

We start, of course, from the premise that so far as the Sherman Act and the Federal Trade Commission Act are concerned,[13] a price-fixing combination is illegal per se. United States v. Paramount Pictures, Inc., 334 U.S. 131, 143, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. McKesson & Robbins, 351 U.S. 305, 308, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); National Macaroni Manufacturers Association v. Federal Trade Commission, 345 F.2d 421 (7th Cir. 1965). As such, the illegality of price fixing does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. Nor does it make any difference "whether the motives of the participants are good or evil; whether the

13. The courts have construed the Federal Trade Commission Act as being *in pari materia* with the Sherman and Clayton Acts, Menzies v. Federal Trade Commission, 242 F.2d 81 (4th Cir. 1957), cert. den. 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed. 2d 908 (1957), and have allowed the use of cases decided under any of the antitrust laws in dealing with cases brought by the Commission. Federal Trade Commission v. Beech-Nut Packing, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Federal Trade Commission v.

Motion Picture Adv. Service Co., 344 U.S. 392, 394–395, 73 S.Ct. 361, 97 L. Ed. 426 (1953). Thus it is that violations of the Sherman Act have been held to constitute violations of Section 5 of the Federal Trade Commission Act. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 690, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); National Macaroni Manufacturers Association v. Federal Trade Commission, 345 F.2d 421, 427 (7th Cir. 1965).

price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices." United States v. McKesson & Robbins, supra, 351 U.S. at 309–310, 76 S.Ct. at 940. It is also not important "that the prices * * * were not fixed in the sense that they were uniform and inflexible," nor is the machinery employed by a combination for price fixing material. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 222–223, 60 S.Ct. at 843.

■ As already noted, the Commission found that two price fixing conspiracies existed—a horizontal one among all the dealers accepting consignment, and a vertical one between Sun and each of the dealers accepting consignment. The former was inferred from the pattern of price fixing disclosed in the record. We think there was adequate foundation for such a finding by the Commission. It is well-settled that findings of fact by the Commission, including whether a price fixing agreement was made and performed, if supported by substantial evidence, are conclusive. National Macaroni Manufacturers Association v. Federal Trade Commission, supra, 345 F.2d at 426; National Lead Company v. Federal Trade Commission, 227 F.2d 825, 832–833 (7th Cir. 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); Fort Howard Paper Co. v. Federal Trade Commission, 156 F.2d 899, 906–907 (7th Cir. 1946), cert. den. 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680 (1946); Phelps Dodge Refining Corp. v. Federal Trade Commission, 139 F.2d 393, 395 (2d Cir. 1943). The weight to be given to the facts and circumstances, as well as the inferences reasonably to be drawn therefrom, is for the Commission. National Macaroni Manufacturers Association v. Federal Trade Commission, supra, 345 F.2d at 426; Federal Trade Commission v. Pacific Paper Association, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534 (1927); Independent Grocers Alliance Distributing Co. v. Federal Trade Commission, 203 F.2d 941, 945 (7th Cir. 1953). A price fixing agreement and the existence of a price fixing conspiracy may be inferred or implied from the acts and conduct of the parties, as well as from the surrounding circumstances. National Macaroni Manufacturers Association v. Federal Trade Commission, supra, 345 F.2d at 426–427; National Lead Company v. Federal Trade Commission, supra, 227 F.2d at 832–833; Triangle Conduit & Cable Co. v. Federal Trade Commission, 168 F.2d 175, 179–180 (7th Cir. 1948), aff'd sub nom. Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949); Goodman v. Federal Trade Commission, 244 F.2d 584, 602 (9th Cir. 1957); Allied Paper Mills v. Federal Trade Commission, 168 F.2d 600, 606 (7th Cir. 1948), cert. den. 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949).[14]

14. The evidence taken by the hearing examiner was that, at the meetings of November 5, 1956, and after the consignment plan had been explained and offered to the dealers by Southard, there was a general discussion among the dealers themselves as to the pros and cons of the proposition. Conversations among the dealers took place both in and out of Southard's presence. Of particular import to the dealers was whether they should stay within one cent of the independents—also discussed at this time—for it was clear, as the Commission found, that the extent to which such a uniform reduction was to be maintained, "cooperation and participation by all was necessary." At the conclusion of the discussions, all dealers present signed consignment agreements. On the afternoon of the day the contracts were signed, Sun prices (with three exceptions) were dropped three cents to 27.9 cents per gallon, the proffered price. Thus supported was the finding of the Commission that "there was an interdependence in the dealers' decisions to participate in respondent's consignment plan" amounting to a horizontal price fixing device in violation of the Federal Trade Commission Act.

On the other hand, the vertical conspiracy—that between Sun and each of the dealers accepting consignment—was evidenced by express written agreements and was plainly established. In fact, Sun readily admits that the commission consignment contracts included a provision whereby Sun was to fix prices and, moreover, acknowledges that it did so while the consignment plan was in effect. Sun defends this method of vertical price fixing by reference to the traditional notion of the nature of consignment selling and by noting that the antitrust laws condemn only the fixing of prices on articles of commerce to be *resold* by another and leave the real seller or owner of the goods, in whom title rests immediately prior to sale, entirely free to fix any price he might see fit.

Sun's argument in this respect is as follows: In the judicial development of Sections 1 and 2 of the Sherman Act, the general rule evolved that vertical arrangements for retail price fixing [15] are illegal. But to this general rule, the Supreme Court recognized at least one significant exception, namely, that while vertical arrangements whereby goods sold to dealers can be resold only at prices fixed by the manufacturer-seller are considered illegal restraints of trade, sellers who *consign* their products to *agents* are free to set the price at which their products may be sold. The leading case on the validity of the consignment device in retail price maintenance is United States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), wherein the General Electric Company attempted to fix the retail price of incandescent lamps, upon which it held an exclusive patent, by converting all its dealer outlets into its own agents and requiring dealer inventory to be placed on consignment. There the Supreme Court unanimously held that "genuine contracts of agency * * *, however comprehensive as a mass or whole in their effect," did not violate the Sherman Act, because the Act did not prohibit the "owner of an article patented or otherwise," from disposing of it "directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer." [16] Id. at 488, 47 S.Ct. at 196. Sun further contends that the Supreme Court, in the later case of Standard Oil Company of California and Standard Stations v. United States, 337 U.S. 293, 310, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), suggested that a marketer of gasoline could employ agency relationships with its dealers as a method of selling in a market area. There being no "resale" by the consignee, Sun concludes, this form of marketing is immune from the rule against vertical price control, and to rule to the contrary would be to impinge upon the integrity of the "ancient, lawful, broadly-used business practice" of consignment selling.

The Commission, however, in support of its order, distinguished General Electric from the instant case on the ground that this price fixing was horizontal as well as vertical. We think this distinction was well-taken. In United States

---

15. The terms "vertical price fixing" and "resale price maintenance" are often used interchangeably. Resale price maintenance has been defined as " 'pricing through agreements or conspiracies between two or more persons operating at different levels of the same production-distribution-consumption process.' " Kronstein, Modern American Antitrust Law 145 n. 1 (1958), quoting from Kronstein & Miller, Regulation of Trade 850 (1953). The terms are used interchangeably in the course of this opinion.

16. Inasmuch as the General Electric case was concerned solely with a patented product, the language "patented or otherwise" is clearly dictum. However, because of such dicta in General Electric, it has been thought by many that the consignment device for resale price maintenance was not inconsistent with the antitrust laws no matter how large the system involved and regardless of the non-existence of a patented product. Thus it is that "[r]esale price maintenance of gasoline through the 'consignment' device is increasing." Simpson v. Union Oil Company of California, 377 U.S. 13, 19, 84 S.Ct. 1051, 1055, 12 L.Ed. 2d 98 (1964), citing H.R.Rep.No. 1157, 85th Cong., 1st Sess., pp. 6–7.

v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), the Supreme Court held invalid the use of an agency to effect horizontal price maintenance in the distribution of patented products. Masonite, the holder of a patent on hardboard, entered into agency agreements with competitiors [17] under which they were made del credere agents, the product was shipped on consignment, title remained in Masonite, and Masonite established the prices at which the product was to be sold. The existence of a valid agency [18] did not deter the Court from finding an antitrust violation: "We assume * * * that the agreements constituted the appellees as del credere agents of Masonite. But that circumstance does not prevent the arrangement from running afoul of the Sherman Act." Id. at 277, 62 S.Ct. at 1077.

In striking down the horizontal conspiracy in Masonite for the fixing of prices, the Court was unmoved by the fact that each participant, other than Masonite, in negotiating and entering into the first agreements acted independently of the others, negotiated only with Masonite, desired agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussion with any of the others. Stating that "[p]rices are fixed when they are agreed upon," Id. at 276, 62 S.Ct. at 1076, the Court went on to say (quoting Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939)):

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. * * * It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. * * Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful

17. The fact that Masonite involved competitors rather than vertical customers, as was the case here, is not a factor upon which that case can be distinguished. The Supreme Court has stated clearly that the elimination of competition among retail distributor purchasers by price-fixing is illegal per se, just as is such pricefixing among competitors. United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915 (1948); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). The rule is applicable here where Sun retail dealers were, to greater or lesser degree, in competition with each other. Cf., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

18. In holding Sun's consignment plan unlawful, the Commission did not find that "it did not constitute a genuine consignment under the law of agency." Supra, text at note 3. Yet there were aspects of the relationship between Sun and its dealers after consignment was put into effect that did not conform to the purported agency. For example, a portion of the rental paid to Sun by dealers who leased station premises was for the storage of gasoline on said premises. This portion of the lease agreements was never amended, even though after consignment title to the gasoline did not pass to the dealers. Thus, after consignment, the dealers continued to pay rent for the storage of gasoline, gasoline which was not theirs. Secondly, the dealers continued to hold themselves out as "proprietors", not as agents of Sun, after going on consignment, again in accordance with the unamended pre-consignment lease agreements. And finally, under local law the dealers were required to pay a retail merchants' license to sell gasoline. After the adoption of commission consignment, they continued to pay this license or tax until 1958, when Sun began to pay it after the tax officials called it to Sun's attention. Sun now contends this was the result of mere oversight. However, Sun did not go so far as to refund the license payments theretofore made by the dealers.

conspiracy under the Sherman Act. Id. at 275, 62 S.Ct. at 1076.

While we have followed the Commission in holding the decision in the General Electric case distinguishable from that now before us on the basis that we are here concerned with horizontal as well as vertical price control, additional support for this position—not then available to the Commission—is now available to us by virtue of the recent decision in Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051 (1964).[19] In Simpson, the Court apparently for the first time, sustained a direct attack on the "exception" to per se illegality of vertical price control theretofore thought to have been carved out by General Electric. Rather than overruling General Electric expressly, however, Mr. Justice Douglas, speaking for a majority of five, chose to limit it to its special facts, emphasizing that the con-signment considered in that case covered a patented product.[20] Thus limited, it is now undoubtedly the law that, with regard to unpatented products, no such "exception" exists.[21]

This is not to say that Simpson should be construed to hold all consignment agreements illegal per se under the antitrust laws. At this juncture, the best course is to view Simpson limited by its own particular factual context, and to proceed case-by-case where consignment systems resulting in vertical price control are involved.[22] This being so, it is well to acknowledge the fact that the Court in Simpson, after disposing of General Electric, observed that "[b]y reason of the lease and 'consignment' agreement dealers are coercively laced into an arrangement under which their supplier is able to impose noncompetitive prices on thousands of persons whose prices otherwise might be competitive,"[23]

19. The essential facts in Simpson are as follows: In conjunction with renewable one-year leases on its retail outlets, Union Oil entered into consignment agreements with its lessee dealers, under which it controlled the retail price and retained title to and paid all property taxes on the consigned gasoline until it was sold. The dealer, on the other hand, received a guaranteed commission from Union, was obliged to carry personal liability and property damage insurance, was responsible for any ordinary losses of consigned gasoline, and paid his own costs of operation. Two months before his lease expired, Simpson, Union's dealer-lessee, lowered his price on regular gasoline two cents below Union's authorized price. Union then refused to renew the lease and the agreement expired, Union resuming possession of the premises. Thereafter, Simpson brought suit for damages under § 4 of the Clayton Act for violation of §§ 1 and 2 of the Sherman Act. The district court granted Union's motion for summary judgment, the Court of Appeals affirmed, and the Supreme Court reversed.

20. The view of Mr. Justice Douglas that the existence of a patented product constituted the "*ratio decidendi*" of General Electric has been severely criticized. See,

e.g., Simpson v. Union Oil Company of California, 377 U.S. at 25, 84 S.Ct. 1051 (dissenting opinion of Mr. Justice Stewart); Lyons v. Westinghouse Electric Corporation, 235 F.Supp. 526, 535 n. 1 (S.D.N.Y.1964); Handler, Seventeenth Annual Review of Antitrust Developments—1964, 19 Record of N.Y.C.B.A. 379 (1964); Handler, Recent Antitrust Developments—1964, 63 Mich.L.Rev. 59, 60 (1964). Nevertheless, it seems clear that General Electric could be limited to its special facts and need not be overruled for the reason that all references therein to non-patented products were dicta. See note 16, supra.

21. "Whether * * * (Simpson) amounts to overruling General Electric or merely limiting it is a matter of semantics. The practical effect is the same, whichever word one uses. I cannot escape the conclusion that where no controlling patents are present, the rule laid down in General Electric, at least for the future, is no longer law." Lyons v. Westinghouse Electric Corporation, 235 F.Supp. 526, 535 (S.D.N.Y.1964).

22. See C.B.S. Business Equipment Corp. v. Underwood Corporation, 240 F.Supp. 413, 425 (S.D.N.Y.1964), for a similar application of Simpson.

23. 377 U.S. at 21, 84 S.Ct. at 1057.

and held, in reliance on United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), that "resale price maintenance through the present, coercive type of 'consignment' agreement is illegal under the antitrust laws * *." 377 U.S. at 24, 84 S.Ct. at 1058.

In this case, the Commission did not make a finding of the type of coercion evident in Simpson. It is clear that the hearing examiner did find a form of "economic coercion", but the Commission did not appear to rely upon it in any way.[24] Nor did the Commission find that form of coercion found in Atlantic Refining Co. v. Federal Trade Commission, 344 F.2d 599 (6th Cir. 1965), wherein the gasoline dealer was offered the "Hobson's Choice" of "economic disaster or the consignment agreement." [25] 344 F.2d at 607. Therefore, at least for the present, we cannot hold the facts presented by this record controlled by Simpson. This is so for the reason that, even though we might believe existed in this case the type of coercion that Atlantic Refining brought within the purview of Simpson—as did the hearing examiner, "we recognize that it is the Commission which has the ultimate responsibility of finding the facts and that it is the findings of the Commission that we are authorized to review." Folds v. Federal Trade Commission, 187 F.2d 658, 660 (7th Cir. 1951); Bond Crown & Cork Co. v. Federal Trade Commission, 176 F.2d 974 (4th Cir. 1949). However, this is not to say that Simpson is not at all apposite to the instant situation, for it is. Just as Simpson is not to be read to hold all consignment plans illegal per se, by limiting that case to its facts does not mean that all consignment plans not coercively induced are legal per se. Our understanding of Simpson compels us to scrutinize closely this and all other such forms of consignment marketing in this industry and others.

██ Thus, in sustaining the order of the Commission against respondent, Sun Oil Company, we hold, in principal reliance upon United States v. Masonite Corporation, supra, and Simpson v. Union Oil Company of California, supra, that where a commission consignment plan such as this, otherwise valid as measured by the law of agency, and even though not coercively induced, results in horizontal as well as vertical price control, such consignment plan constitutes an illegal price fixing device and an unfair method of competition and unfair practice in violation of the Federal Trade Commission Act. Such a commission consignment plan as we have here we find to be illegal per se, for its evil—like the plan condemned in Simpson—"is its inexorable potentiality for and even certainty in destroying competition in retail sales of gasoline by * * * 'consignees' who are in reality small struggling competitors seeking retail gas customers." 377 U.S. at 21, 84 S.Ct. at 1057.

██ In so holding, we are not deterred by respondent's contention that finding an antitrust violation on these facts would render nugatory for commercial purposes the "ancient, lawful, broadly-used business practice" of consignment selling. Here, respondent seems to be of the position that a valid agency and an antitrust violation are mutually exclusive, and that the former constitutes an absolute defense to a charge of the latter. In view of the policy considerations at stake, we do not approve of such rationale, and, in accordance with the Commission, find both to have existed. "The interests of the

24. With regard to coercion, the Commission merely found that "a combination or conspiracy was instituted even though dealers were not uniformly desirous of entering into the arrangement proposed by the respondent." The word "coercion" is not even present in the Commission's opinion.

25. This is particularly striking in view of the findings of the hearing examiner. Supra, text at note 9 and text preceding note 11. It is also noteworthy that the Commission's opinion in Atlantic Refining was handed down on May 16, 1963, just a day after it handed down its opinion in this case.

Government \* \* \* frequently override agreements that private parties make. Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy." 377 U.S. at 18, 84 S.Ct. at 1055.

 Nor are we deterred by the contention of respondent that the Commission lacked jurisdiction in this matter because the gasoline retailed to the consuming public pursuant to the commission consignment agreements did not constitute sales "in commerce" within the meaning of § 5 of the Federal Trade Commission Act. On the contrary, the Commission found that in the course and conduct of its interstate business, Sun transports its gasoline in tank cars, tankers and trucks from its different refineries, terminals, and distribution points, located in various states, to retail dealers in the Norfolk area. It held that the agreement or combination between Sun and its dealers fixing the retail prices was engaged in the course of such business and, therefore, in interstate commerce. We agree.

Sun urges the case of Federal Trade Commission v. Bunte Bros., Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941), as decisive here in its favor. We find it to be clearly distinguishable. In that case, quite contrary to this, the unfair methods of competition sought to be regulated by the Commission were admittedly confined to activities wholly within the State of Illinois relating to goods manufactured in Illinois and which had been at no time in interstate commerce. Cf., Holland Furnace Company v. Federal Trade Commission, 269 F.2d 203, 209–213 (7th Cir. 1959), cert. den. 361 U.S. 932, 80 S.Ct. 369, 4 L.Ed.2d 353 (1960). In this case, Sun shipped its gasoline products to its Norfolk area dealers from points outside the State of Virginia. Such interstate character of the distribution process did not cease merely because the gasoline in question may have come to a temporary rest in storage tanks in the Norfolk area. Standard Oil Company v. Federal Trade Commission, 340 U.S. 231, 238, 71 S.Ct. 240, 95 L.Ed. 239 (1951).

 Furthermore, Sun's attempt to confine the scope of this consignment plan to the 25 dealers in the Norfolk area misconceives the nature and purpose of Commission proceedings. The Federal Trade Commission Act empowers the Commission to prohibit any practice "which (has) restrained competition or might lead to such restraint if not stopped in its incipient stages." Federal Trade Commission v. Cement Institute, 333 U.S. 683, 693, 68 S.Ct. 793, 799, 92 L.Ed. 1010 (1948); Federal Trade Commission v. Raladam, 316 U.S. 149, 152, 62 S.Ct. 966, 86 L.Ed. 1336 (1942). The record in this case would indicate that Sun's consignment plan was adopted in its Norfolk District pursuant to general directives used to combat price wars wherever they might occur. Thus, the fact that, when used, this price fixing mechanism affected only local retail sales of gasoline surely cannot be controlling. Retail sales, like price wars, are most always "local"—they were here and they were in Union Oil's "vast distribution system." 377 U.S. at 21, 84 S.Ct. 1051. There is no doubt but that this consignment plan involved goods engaged in interstate commerce and was effected by a company policy conceived with a view to application wherever price disturbances affected its operations.

The order and opinion of the Federal Trade Commission is affirmed. An order for enforcement may be presented.

Affirmed.